Judith Diane Duff **LEACH**, Etc., et al.,
Plaintiffs–Appellants,

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION**, et al.,
Defendants–Appellees.

No. 87–1921.

United States Court of Appeals,
Fifth Circuit.

Dec. 2, 1988.
Rehearing Denied Jan. 3, 1989.

Franklin H. McCallum, Midland, Tex., for Leach.

John C. Eichman, Ray Guy, Dallas, Tex., for FDIC.

Linda L. Rutherford, Jeff Joyce, Dallas, Tex., for MBank Dallas.

John C. Sims, Lubbock, Tex., for Herman.

Wm. F. (Pete) Baker, Abilene, Tex., for Watts, Hart & Newcomb.

Cecil C. Kuhne, Tom S. Milam, Lubbock, Tex., for Clark, Dearing, Hoffman, Wickson, Haralson, Clothes & Caule.

George Shivers, Dallas, Tex., pro se.

Tom S. Richards, Dallas, Tex., for Skelton.

Paul Condit, Seminole, Tex., pro se.

Michael H. Carper, Lubbock, Tex., for Condit.

Before GOLDBERG, HIGGINBOTHAM and DAVIS, Circuit Judges.

GOLDBERG, Circuit Judge:

■ Bodyless souls do not walk with feet of clay. Without feet, they cannot stand. The Plaintiffs–Appellants in this case would have us don sovereign robes and create feet of clay for them. We shall not array ourselves with such fine garments, and thus we will not, and cannot, accede to the Plaintiffs' request.[1]

Plaintiffs are minority shareholders of the Seminole State National Bank ("Bank"). The Appellees–Defendants include former directors and officers of the failed Bank[2], the Federal Deposit Insurance Corporation, in its capacity as Receiver of the failed Bank, and MBank Dallas, a creditor of the failed Bank. According to the complaint, Plaintiffs' Bank stock lost all of its value because of mismanagement of the Bank by Defendant directors. Plaintiffs asserted two causes of action against the Defendants. The first claim arises under the National Bank Act, 12 U.S.C. § 93(a) (1982). The second claim arises under 18 U.S.C. § 1964(c) (1982), the Racketeer Influenced and Corrupt Organization Act ("RICO").

The district court granted the Defendants' motions to dismiss for failure to state a claim for lack of standing. We agree, and hold that a minority shareholder cannot assert a claim as an individual under the circumstances of this case pursuant to either the National Bank Act, Section 93(a) or RICO, Section 1964(c). Accordingly, we AFFIRM the judgment of the district court.

## I. FACTUAL BACKGROUND

According to Plaintiffs' first amended complaint,[3] they owned approximately 3,300 shares of the Bank's stock which constituted a minority ownership in the Bank. The directors and officers allegedly failed to manage properly the business matters of the Bank and failed to advise the Plaintiffs in a proper and timely manner of the true financial condition of the Bank. Plaintiffs allege that MBank concealed the true financial condition of the Bank from the Plaintiffs when MBank Dallas knew of, and helped to conceal, the fraud and mismanagement perpetrated by the Defendant directors. Plaintiffs allege that they have suffered actual damage because they have lost the value of their stock as a direct result of the Defendants' misbehavior.

Our decision focuses on whether the Plaintiffs have standing to assert claims arising from the diminution in the value of

---

1. *See The Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 636, 4 L.Ed. 629 (1819) ("A corporation is an artificial being, invisible, intangible and existing only in contemplation of law").

2. The directors and officers of the Seminole State National Bank who have filed separate responses as appellees are B.C. Clark, Paul Condit, Walker Dearing, Jr., Dwayne Herman, D.G. Hoffman, C.D. Wickson, Jr., Carroll Haralson, Alton Freeman, Reeves Cothes, George Shivers, Dr. Joe Cauley, Richard Watts, S.H. Hart, Sr., Kenneth Newcomb and R.D. Skelton, Sr.

3. Because the district court dismissed Plaintiffs' first amended complaint on motions to dismiss, we will accept all of Plaintiffs' allegations as true. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

their stock. The Plaintiffs filed their complaint on March 14, 1986. This was nearly two years after the Comptroller of the Currency declared the Bank insolvent and appointed the FDIC as Receiver of the Bank on March 16, 1984. Before filing their complaint, Plaintiffs did not make a demand on the FDIC–Receiver requesting the FDIC to file a direct action against the Defendant directors. As we shall see, this plays a significant role in our standing inquiry.[4]

## II. DISCUSSION

The district court dismissed Plaintiffs' first amended complaint for a lack of standing. It held that for minority shareholders to maintain an action under either the National Bank Act, 12 U.S.C. § 93(a), or RICO, 18 U.S.C. § 1964(c), Plaintiffs needed to allege "some injury other than a decline in the value of the bank stock in order to state a direct, personal injury distinct from that suffered by the corporation that would permit [the Plaintiffs] to maintain an individual cause of action." The district court then gave the Plaintiffs leave to amend their complaint, against all Defendants except the FDIC, to allege a direct injury or state another cause of action. The Plaintiffs did not file another complaint. Plaintiffs now urge us to reverse the district court and find that they have standing to assert their claims against the Defendants.

The Plaintiffs assert that they have standing to sue under both the National Bank Act, 12 U.S.C. § 93(a), RICO, 18 U.S.C. § 1964(c), and the Federal Reserve Act, 12 U.S.C. § 503. An earlier decision of this court, *Crocker v. Federal Deposit Insurance Co.*, 826 F.2d 347, 349 (5th Cir.1987), controls the RICO claim. In contrast, the National Bank Act issue, requires a fuller and more detailed consideration. Nonetheless, we conclude that these minority shareholders do not have standing to assert their claim under 12 U.S.C. § 93. The Plaintiffs also contend improperly that they

have a cause of action under the Federal Reserve Act, 12 U.S.C. § 503. They failed to raise this claim below and we will not consider it now.

### A. Minority Shareholders' Standing Under The National Bank Act, 12 U.S.C. § 93(a)

For the court to hear a person's complaint, a person must have "standing" to assert the claim. The Supreme Court has expressed the notion of standing using various verbal formulae over the years. Some of these tests have included (1) "the injury in fact" and "zone of interest" tests, *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970); (2) "the threatened or actual injury" test, *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973); and (3) "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting person in Plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

Essentially, standing analysis involves two separate prongs. The first prong is "injury in fact." *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). This prong tests a person's genuine concern with the case in order to insure the integrity of the adversarial process. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Sometimes Congress statutorily defines who is injured in fact. *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148 n. 3, 35 L.Ed.2d 536 (1973). Our case does not involve this "injury in fact" prong. Plaintiffs have alleged a real and distinct injury—the loss of the value of their stock.

It is the second prong of standing law, what is sometimes referred to as the "zone of interest" test, that is the focus of our decision. "The zone of interest test is a

---

**4.** The FDIC–Receiver for the failed bank has advised us that it has sued the directors based

upon the allegations in the Plaintiffs' complaint.

guide for deciding whether ... a particular plaintiff should be heard to complain of a particular" injury. *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987); *see Block v. Community Nutrition Institute,* 467 U.S. 340, 347, 104 S.Ct. 2450, 2454–55, 81 L.Ed.2d 270 (1984) (essential inquiry is whether Congress intended a particular class of plaintiffs to be able to sue). "The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke,* 107 S.Ct. at 757.

### 1. History of 12 U.S.C. § 93(a)

To decide whether a plaintiff is arguably within the zone of interest recognized by a particular statute, it is necessary first to examine the statute itself to determine whether Congress intended to allow the plaintiff to sue.

■ On its face, 12 U.S.C. § 93(a) is worded broadly and appears to allow a wide range of suits for injuries allegedly resulting from the misconduct of a bank's directors, agents or officers. However, the historical context in which the provision was passed, the judicial decisions which followed its passage, and judicial decisions from the modern era, all militate in favor of a narrower reading of Section 93(a) than the reading advocated by Plaintiffs. Thus, we conclude that Congress intended the statute, 12 U.S.C. § 93(a) to differentiate between persons who have suffered injury which the law treats as "corporate" injury and persons who have suffered injury which the law treats as "personal" to the person.

For example, when a director embezzles the assets of a corporation, and the value of the corporation's stock falls as a result, the law treats the corporate body as the injured party, not the individual stockholder who has lost the value of his stock. On the other hand, the law treats a person who *buys* stock in reliance on false information from a director as personally injured by the director's conduct. *See Chesbrough v. Woodworth,* 244 U.S. 72, 88, 37 S.Ct. 579,

586, 61 L.Ed. 1000 (1917). On a certain level, the difference is a matter of *diffusion* of injury. That is, when all shareholders are wounded it is the corporate body itself which the law treats as experiencing the pain. When only one person suffers and the other shareholders have not been hurt by the misconduct, the law recognizes that person's pain as personal.

■ Plaintiffs in this case seek to show that they are different from all the other stockholders because they are the only ones who have lost money from the directors' mismanagement. However, corporate law, as it existed when the National Bank Act was passed in 1864, treated a director's mismanagement, resulting in a diminution in the corporation's stock value, as a corporate injury. The right to complain of the injury belonged then and belongs now to the corporation. There are exceptions to this rule that allow shareholders to sue derivatively for corporate injury. They arise, for example, when the corporation refuses to sue after being asked by the shareholder, or when the corporation has been "captured" by the misbehaving directors so that any demand made would be in vain. But these exceptions only provide mechanisms to protect the corporation when it will not or cannot protect itself. In this case, any possible legal relief for Plaintiffs' grievances belongs to the corporate body now in the hands of the FDIC–Receiver, not the Plaintiffs.

The first step in our standing inquiry under Section 93(a) requires us to examine the statute. Section 93(a) of the National Bank Act reads:

If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this chapter, all the rights, privileges, and the franchises of the association shall be thereby forfeited. Such violation shall, however, be determined and adjudged by a proper district or Territorial court of the United States in a suit brought for that purpose by the Comptroller of the Currency, in his own name, before the

association shall be declared dissolved. And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation.

This statute was enacted June 3, 1864, as part of a comprehensive act, the National Bank Act.[5] The stated purpose of the Act is "to provide a national currency secured by a pledge of United States bonds, and to provide for the circulation and redemption thereof[.]" 12 U.S.C. § 38 (1982).

This statute on its face would appear to permit Plaintiffs to sue the Defendants for alleged mismanagement which allegedly caused Plaintiffs' stock to lose its value. The last sentence of section 93(a) states that "every director who participated [in a violation of the Bank Act] shall be held liable in his personal and individual capacity for all damages which the association, *its shareholders*, or any other person, shall have sustained in consequence of such violation" (emphasis added). However, even apparently plain words, divorced from the context in which they arise and in which their creators intended them to function, may not accurately convey the meaning the creators intended to impart. It is only, therefore, within a context that a word, any word, can communicate an idea.

Section 93(a) of the National Bank Act as enacted in 1864 was not created in a vacuum.[6] In this pre-*Erie v. Tompkins,* era, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), it was commonly understood that there existed a general commercial common law. In 1856, the United States Supreme Court, in a commercial case involving a Mississippi statute, stated:

The general commercial law being circumscribed within no local limits, nor committed for its administration to any peculiar jurisdiction, and the Constitution and laws of the United States having conferred upon the citizens of the several States, and upon aliens, the power or privilege of litigating and enforcing their rights acquired under and defined by that general commercial law, before the judicial tribunals of the United States, it must follow by regular consequence, that any state law or regulation, the effect of which would be to impair the rights thus secured, or to devest the federal courts of cognizance thereof, in their fullest acceptation under the commercial law, must be nugatory and unavailing.

*Watson v. Tarpley,* 59 U.S. (18 How.) 517, 521, 15 L.Ed. 509 (1856). In 1864, general commercial law created a background upon which a statute could be drawn to provide context for the abstract ideas encompassed in the statute. The interstices of a federal commercial statute were also meant to be filled by the prevailing general commercial law norms.

The particular area of the general commercial law which provides a background for the National Bank Act is corporate law. While the antecedents of the modern corporation reach back to Ancient Rome,[7] the large commercial corporations of the modern era began to make their appearance in the form of the great trading houses of England during the middle of the Seventeenth Century.[8] By the time of Chief Justice John Marshall, the corporate entity as we know it had begun to take shape. Justice Marshall, in the *Dartmouth College* case of 1819, described the corporation as follows:

A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly or

---

**5.** Section 93(a) remains essentially unchanged from its original enactment as reflected at 13 Statutes at Large 116. This is the same section as Revised Statutes § 5239.

**6.** There is no pertinent legislative history for Section 93(a).

**7.** 1 W. Blackstone, Commentaries *468, 469.

**8.** Some of the more familiar trading corporations were the East India Company and Hudson Bay Company. 1 W. Fletcher, *Fletcher Cyclopedia Corporations,* § 1 (rev. perm. ed. 1983).

as incidental to its very existence. These are such as are supposed best calculated to effect the object for which it was created. Among the most important are immortality, and, if the expression may be allowed, individuality; properties by which a perpetual succession of many persons are considered as the same, and may act a single individual. They enable a corporation to manage its own affairs, and to hold property without the perplexing intricacies, the hazardous and endless necessity, of perpetual conveyances for the purpose of transmitting it from hand to hand. It is chiefly for the purpose of clothing bodies of men, in succession, with these qualities and capacities, that corporations were invented, and are in use. By these means, a perpetual succession of individuals are capable of acting for the promotion of the particular object, like one immortal being.

*The Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 636, 4 L.Ed. 629 (1819); *see generally* Comment, *The Personification of the Business Corporation in American Law,* 54 U.Chi.L. Rev. 1441 (1987).

As part of the general commercial common law, it was understood that only the corporate body could sue misbehaving directors for wounds that the corporation suffered resulting from directors' misconduct. One commentator of the late Nineteenth Century explained the law as follows:

> [F]rauds, *ultra vires* acts, and acts of negligence [by the directors], are injuries to the corporation, and the corporation is ordinarily the party to bring suit to rectify them. The frauds, *ultra vires* acts, and negligence of directors, do not affect the stockholder directly, but they affect the stockholders indirectly by decreasing the corporate assets, and thereby affecting the value and privileges of the stock.

\* \* \* \* \* \*

It was [during 1742 to 1850] the duty of the corporation to bring suit to remedy these wrongs. But it gradually became apparent that frequently the corporation was helpless, and unable to initiate the suit.... The time had come when the minority of the shareholders of a defrauded corporation, the corporation itself being controlled by the guilty parties, must be given a standing in court for the purpose of taking up the cause of the corporation, and in its name and stead bringing the guilty parties to an account.

W. Cook, *Law of Stock and Stockholders* § 644–45 (1887).[9] In 1882, the Supreme Court, in *Hawes v. City of Oakland,*[10] echoed the view commentator Cook put forth concerning the general commercial law of derivative actions.

What we today term a shareholder derivative suit was a part of the general commercial common law when Congress enacted Section 93(a) in 1864. When writing Section 93(a), Congress relied upon the fact that injured shareholders did not possess a right of action against delinquent directors until the corporation itself had refused to bring suit. In our post-*Erie v. Tompkins* era, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this idea of an enforceable background of general commercial law does not exist. But it is this context which gives meaning to the phrase "every director ... shall be liable ... for all damages which the association, its shareholders, or any other person, shall have sustained...." 12 U.S.C. § 93(a).

Judicial decisions rendered after 1864, but before *Erie,* demonstrate further that Section 93(a) has a narrower reach than its language facially suggests. A court in 1882, when construing Section 93, stated:

> When the clause in question [Section 93(a)] gives a private remedy, derived from the misconduct of the directors, to the individual stockholder, the only reasonable deduction from the words and

---

9. For another 1864 contemporary commentator's view on this subject, see C. Beach, *Commentaries on the Law of Private Corporations,* §§ 878–87 (1891).

10. 104 U.S. 450, 460–61, 26 L.Ed. 827 (1882); *see also Dodge v. Woolsey,* 59 U.S. (18 How.) 331, 15 L.Ed. 401 (1856).

purposes of the law is, that such redress is aimed at injuries directly and not indirectly falling on such stockholder. In the present case, the injury is indirect and derivative: the plaintiff has suffered a loss because the property of the corporation was squandered, purloined or lost. Now, for such a loss the statute gives to the company the right to obtain an indemnification by suit, and by such recovery the indirect and derivative loss of the stockholders is, *ipso facto*, repaired.

*Conway v. Halsey,* 44 N.J.L. 462, 466 (1882) (Plaintiff's stock rendered worthless by director misconduct.) [11]

In contrast, the type of Bank Act violation that injures a particular plaintiff personally but does not injure the corporation is illustrated by *Chesbrough v. Woodworth,* 244 U.S. 72, 77, 37 S.Ct. 579, 582, 61 L.Ed. 1000 (1917). In *Chesbrough,* the defendant directors made false and misleading reports concerning the financial condition of the bank. *Id.* at 73, 37 S.Ct. at 580. The plaintiff suffered damage because he *"purchased* stock upon the faith of the action of Defendants." *Id.* at 74, 37 S.Ct. at 581 (emphasis added). The bank suffered no damage. The injury created by the purchase of worthless stock was personal to the plaintiff.[12]

The critical distinction which must be made is to see how our Plaintiffs differ from *Chesbrough* plaintiffs. The Plaintiffs in this case owned their stock *before* any mismanagement by the directors destroyed the value of the stock. In *Chesbrough,* the Plaintiffs were lured into becoming stockholders by the directors' false reports. All stockholders in *Chesbrough* were not proportionately hurt by the directors' misbehavior. Only the *Chesbrough* stockholders were hurt by the false reports. In our case, all the stock lost its value because of the directors' mismanagement. Thus, only the FDIC–Receiver may now sue mismanaging directors.

Plaintiffs in this case do not fall within either of the two exceptions to this notion that would allow them to sue derivatively: (1) where they make a demand upon corporation and the corporation refuses to sue; or (2) misbehaving directors or officers have "captured" the corporation so that any demand to sue would be a useless action. Plaintiffs did not plead that they had asked the corporation to bring a case against the alleged misbehaving Directors. Such an effort would have been meaningful. The FDIC was appointed as Receiver for the insolvent corporation on March 16, 1984. Plaintiffs filed their original complaint two years later, on March 14, 1986. The FDIC is not related in any way to the alleged misbehaving directors. If the Directors had still been in control of the corporation at the time the Plaintiffs filed suit, then a demand upon the corporation to bring suit against the directors might have constituted a vain effort to bring the directors to justice. A suit brought while allegedly wrongful directors are still in control is essentially a derivative action. However, nothing of the sort is involved in our case. No demand was pled in this case in a situation in which doing so would have been a meaningful act.

### 2. Modern Era Standing Decisions in the Corporate Law Context

Modern decisions from other circuits in the corporate law standing context bolster our conclusion. *See Gaff v. Federal Deposit Insurance Corp.,* 814 F.2d 311 (6th Cir.), *reh'g on other grounds,* 828 F.2d 1145, 1146 (1987) (state law claims). Our result also accords with the Ninth Circuit's decision in *Harmsen v. Smith,* 542 F.2d 496, 502–03 (9th Cir.1976). A cursory reading of *Harmsen* may leave the impression that it conflicts with our decision. A careful reading, however, that pays close attention to the procedural posture of *Harmsen* and the identity of the plaintiffs, reveals

**11.** *See Howe v. Barney,* 45 F. 668 (C.C.S.D.Ohio 1891).

**12.** *Compare Empire Life Ins. Co. of America v. Valdek Corp.,* 468 F.2d 330, 335–36 (5th Cir. 1972) (an example of direct injury arising out of an independent, direct duty) *with Stevens v. Lowder,* 643 F.2d 1078, 1079–80 (5th Cir.1981) (loss of value of stock runs to corporation). *See also Zimmern v. Blount,* 238 F. 740, 744 (5th Cir.1917).

that *Harmsen* is in accordance with our result.

In *Harmsen*, two groups of minority shareholders brought class actions against the directors of a bank. 542 F.2d at 498. The FDIC moved to intervene, to substitute and to displace the minority shareholders as the plaintiffs in the case. *Id.* The district court allowed the intervention, disallowed the displacement, and let all minority shareholders, as a class, remain in the case as individuals. The district court then certified the standing issue concerning the minority shareholders, specifically the motion by the FDIC to *displace* the minority shareholders, to the Ninth Circuit. *Id.* The Ninth Circuit affirmed the district court's refusal to permit the FDIC's displacement of the minority shareholders as plaintiffs. The allegations in the plaintiffs' complaint alleged that director-defendants had violated *reporting* requirements. The Ninth Circuit explicitly stated that "Section 93 [is] limited to such sums as will compensate such shareholder for an injury which he, as distinct from the bank, has suffered." *Id.* at 500. After referring to *Chesbrough,* the Ninth Circuit sent the case back to the district court so the district court could reevaluate the class certification of all minority shareholders. *Id.* at 503. Thus, the Ninth Circuit wanted the district court to separate *Chesbrough* plaintiffs (personal injury, direct action) from derivative plaintiffs (corporate injury, only FDIC could have brought action).[13]

We have examined the historical context in which Congress passed 12 U.S.C. § 93(a). From the context, we have learned that a general commercial law, specifically the genesis of the law of derivative suits, provides meaning to the terms of Section 93(a). Courts, before *Erie v. Tompkins,* relied on this general common law when interpreting Section 93(a). Modern courts have arrived at the same result. From all these sources, we conclude that minority shareholders who sue for "corporate" injury do not have standing to sue under Section 12 U.S.C.

§ 93(a), unless one of the two exceptions authorizing derivative actions applies.

**B.  Minority Shareholders' Standing Under RICO, 18 U.S.C. § 1964(c)**

█  Plaintiffs also argue that they have standing to assert a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c). This circuit has considered this same claim in two previous cases and has found it to be wanting.

Plaintiffs' amended complaint alleges that Defendant directors made false representations of material facts in both annual reports and reports of comparative conditions supplied to Plaintiffs. As a direct result, Plaintiffs allege, their stock has become totally worthless in violation of RICO.

RICO's standing provision states:

Any person *injured in his business or property* by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964 (emphasis added). Thus, to satisfy Section 1964(c), a person must allege a RICO action which tends to injure the person's "business or property." *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).

This Circuit has previously addressed whether minority shareholders may maintain a RICO action against directors when their stock has lost value because of the actions of directors or officers. *Crocker v. Federal Deposit Insurance Corp.,* 826 F.2d 347, 349 (5th Cir.1987); *see also Adams–Lundy v. Ass'n of Professional Flight Attendants,* 844 F.2d 245, 250 (5th Cir.1988). In *Crocker,* we held that minority shareholders lacked standing under RICO to sue because they had not alleged any injury to their property that was dis-

---

**13.** The *Harmsen* dissent, apparently believing that there was no class definition issue, argued that only corporate injury had been shown. 542 F.2d 496, 504 (Hufstedler, J., dissenting).

tinct from any injury the corporation may have suffered.

■ The *Crocker* decision looked to Mississippi state law to determine if there had been any "injury" to the plaintiffs. *Crocker*, 826 F.2d at 349. Under Mississippi law, the *Crocker* court determined that plaintiffs had not suffered any individual injury.[14]

Texas adheres to the general rule that a shareholder does not have a direct right of action against a director who has mismanaged the affairs of the corporation. The only right of action the shareholder has is derivative. *Commonwealth of Massachusetts v. Davis*, 140 Tex. 398, 168 S.W.2d 216, 221–22 (1942); *Cates v. Sparkman*, 73 Tex. 619, 11 S.W. 846, 848–49 (1889); *Hughes v. Houston Northwest Medical Center*, 647 S.W.2d 5, 7 (Tex.Ct.App.1982); *Governing House v. Pannill*, 561 S.W.2d 517, 524–25 (Tex.Ct.App.1977); *Joy v. North Texas Compress & Warehouse Co.*, 151 S.W.2d 342, 343 (Tex.Ct.App.1941); *Cullum v. General Motors Acceptance Corp.*, 115 S.W.2d 1196, 1200–03 (Tex.Ct. App.1938).

Plaintiffs have not alleged as individuals any legally cognizable injuries. We therefore affirm the district court's dismissal of Plaintiffs' RICO claims.[15]

### C. Plaintiffs' Federal Reserve Act Claim

■ Plaintiffs also argue that they have standing to assert a cause of action under the Federal Reserve Act, 12 U.S.C. § 503. However, the district court, in dismissing Plaintiffs' claims, did not pass upon this cause of action because this claim was not presented to the district court. The Plain-

tiffs did not allege this cause of action in their first amended complaint. Thus, the Defendants did not receive notice that Plaintiffs were asserting this cause of action. In addition, Plaintiffs failed to discuss this cause of action in their response brief before the district court on the motion to dismiss (R. at 455–504).

We will not deviate from the general rule that appellate courts do not pass upon issues which were not raised in the court below except where injustice might otherwise result. No exceptional circumstances exist here that would create injustice by not reaching the Federal Reserve Act issue. *Singleton v. Wulff*, 428 U.S. 106, 120–21, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *Hormel v. Helvering*, 312 U.S. 552, 556–57, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941); *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1324 (5th Cir.1976). Because the Plaintiffs have improperly asserted their Federal Reserve Act cause of action on appeal, we do not reach the standing issue under 12 U.S.C. § 503.

### CONCLUSION

Plaintiffs, as minority shareholders whose stock has allegedly lost value because of Defendant directors' mismanagement of the Bank, have no standing to assert causes of action under either the National Bank Act, 12 U.S.C. § 93(a), or RICO, 18 U.S.C. § 1964(c).

Shareholders such as the Plaintiffs, who refuse to act through the corporate body, are like a disembodied soul that seeks to walk on the earth without organic feet. Like the Ghost of Hamlet's Father,[16] Plaintiffs seek to influence the temporal world

---

14. This incorporation of state law into federal law (RICO standing in regard to shareholders) implicates a serious problem of uniformity of federal law throughout the states. However, on balance, the incorporation of state law to determine whether a shareholder has been injured under RICO is preferable to generating federal common law in this area. Any definition of the term "property," an inherently state law-related term, should look to state law. *See Reconstruction Finance Corp. v. Beaver County*, 328 U.S. 204, 66 S.Ct. 992, 90 L.Ed. 1172 (1946).

15. The law of this circuit is consistent with decisions of other circuits. *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 29–30 (1st Cir. 1987); *Rand v. Anaconda–Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986); *Warren v. Manufacturers National Bank of Detroit*, 759 F.2d 542, 544 (6th Cir.1985); *Carter v. Berger*, 777 F.2d 1173, 1176 (7th Cir.1985).

16. *Hamlet*, Act I, Scene V.

believing themselves to be more real than the corporate body itself. We will not permit bodyless souls to wander the earth and complain of injury. While the body may stand before a court and complain of its ills, representing the whole being (body and soul), a restless and possibly greedy soul may only do so when the body is either catatonic or has been captured by mutant viruses. In such situations, we will create feet of clay, thereby allowing the soul to stand before us either when the corporate body refuses to stand itself (when a demand is made upon the corporation and the corporation refuses to sue the misbehaving directors) or when the corporate body has become possessed by the illness (when misbehaving directors control the corporation, and a demand to sue would be a vain action).

This case is not such a case and does not resemble such exceptional cases. Therefore, the judgment of the district court is

AFFIRMED.