**Linda S. KAISER, et al.**

v.

**Allen W. STEWART, et al.**

Civ. A. No. 96–6643.

United States District Court,
E.D. Pennsylvania.

May 21, 1997.

As Amended June 10, 1997.

Gerald E. Arth, Ira B. Silverstein, Lisa A. Carney, Fox, Rothchild, O'Brien & Frankel, Philadelphia, PA, for Plaintiffs.

James A. Young, Timothy C. Russell, Christie, Pabarue, Mortensen and Young, Philadelphia, PA, for Allen W. Stewart, Summit Co., Bankers Equity Life Insurance Company, Erin Group Administrators, Inc., Cathedral Life Insurance Company, Covenant Realty, Ltd., Tartan Management Corporation, Tsunami Corporation, Jeanne T. Fletcher, Geoffrey S. Stewart, June P. O'Brien, Paul A. Tamaccio, Pacific Coast Underwriters, Inc.

Daniel J. Di Giacomo, Di Giacomo & Baffa, Philadelphia, PA, for Mary Ann Stewart.

## MEMORANDUM

BARTLE, District Judge.

This is a civil action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, with several pendent state law claims. It involves an alleged scheme to siphon off the assets of two Pennsylvania insurance companies. Presently before the court are motions of the defendants under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the amended complaint for failure to state a claim upon which relief can be granted. We accept all well-pleaded facts of the complaint as true for purposes of these motions. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1391 (3d Cir.1994).

The plaintiff is Linda Kaiser, the Pennsylvania Insurance Commissioner, acting as the Liquidator of Summit National Life Insurance Company ("SNLIC") and Equitable Beneficial Life Insurance Company ("Equitable"). She seeks treble damages arising out of their financial ruin. The defendants are nine individuals, one law firm, two trusts, nine corporations, one other business partnership, as well as unnamed Doe and Roe defendants. According to the amended complaint, defendant Allen W. Stewart ("Stewart"), a lawyer, was the mastermind and coordinator of the scheme to loot SNLIC and Equitable, both of which he owned and/or controlled.[1] He is currently the subject of a related RICO criminal prosecution in this district. *United States v. Stewart*, Criminal Action No. 96–583.

## I

The introductory paragraph of the lengthy amended complaint summarizes the relevant facts as follows:

In a span of less than five years, the defendants, through various acts of malfeasance, misfeasance and nonfeasance, systematically siphoned assets from and mismanaged the affairs of SNLIC and [Equitable], turning what were financially healthy insurance companies into companies with millions of dollars in deficits and leaving in their wake overburdened insurance guaranty funds and, most tragically, uncovered claims.

The facts as set forth in the amended complaint are as follows. Prior to Stewart's purchase of SNLIC, it maintained a surplus of $38 million. Through a series of complex transactions in 1988, Stewart acquired SNLIC, then domesticated in Ohio, with the use of its own funds. With this purchase, Stewart "removed $78 million in liquid assets from SNLIC." The Ohio Insurance Commissioner disapproved some of the transactions surrounding the purchase of SNLIC. As a result, in exchange for Ohio's agreement not to take further action, Stewart redomes-

---

1. While the amended complaint alleges that Stewart owned and/or controlled SNLIC and Equitable, the Liquidator in her briefs states that SNLIC was owned by Summit Company, which we know from a prior proceeding in this case was a partnership composed of five partners with varying ownership interests. Stewart and Mary Ann Stewart each owned 9%. Paul Tamaccio owns another 34%. Two trusts, one for the benefit of Geoffrey Stewart and the other for William Tamaccio, each own 24%. *See Kaiser v. Stewart*, CIV.A. No. 96–6643, 1997 WL 186329 at *4 (E.D.Pa. Apr.10, 1997). Moreover, Affiliated Holdings, Ltd., the ultimate owner of Equitable, is half owned by defendant Mary Ann Stewart. Pls.' Omnibus Mem. of Law in Opp'n to the Mot. to Dismiss the First Am. Compl. at 6. In any event, all these parties are defendants in this action.

ticated SNLIC to Pennsylvania, obtaining the approval of the Insurance Commissioner of the Commonwealth under "false pretenses." Based on misrepresentations, Stewart and his associates convinced the Pennsylvania regulators "to allow SNLIC to issue a $30 million extraordinary dividend" after its redomestication.

Equitable, in its original corporate form, was purchased by Stewart in 1976. Again, through a complicated series of steps the company was divested of its assets, receiving little or no consideration in return. The defendants then participated in various acts in order to conceal the fraud and insolvency of SNLIC and Equitable from the insurance regulators and the policyholders. According to the Liquidator, defendants manipulated the financial records at year end to make both companies appear solvent. For example, Stewart and his associates executed a worthless mortgage in favor of SNLIC. SNLIC also performed services for Equitable in exchange for notes with little or no value, which were listed as assets on SNLIC's books. Affiliated Holdings, Ltd. and Tartan Holdings, Ltd., two other entities owned and/or controlled by Stewart but not named as defendants, borrowed money from SNLIC and then defaulted on a $3 million note given as collateral. A fraudulent reinsurance agreement, disapproved by the California Department of Insurance, was nonetheless entered into between Summit and Alabama Reassurance. This transaction caused a false surplus of $15 million on SNLIC's balance sheet.

The amended complaint also alleges specific instances when defendants improperly utilized SNLIC and Equitable funds. The defendants diverted funds from SNLIC to Cathedral Life Insurance Company, another Stewart entity, which then improperly disposed of such funds. Specifically, Stewart siphoned $2.075 million from SNLIC to pay the mortgage on his California home. SNLIC was made to pay large, improper dividends totalling at least $8.4 million. The defendants caused SNLIC and Equitable to purchase other companies at overvalued prices and then to pay dividends, improper under Pennsylvania law, of over $1.6 million.

Finally, Equitable paid service fees to Erin Group Administrators, a co-defendant, for services not performed, or in the alternative at rates significantly higher than the industry average. Throughout the relevant period, Stewart and his associates made false representations to state regulators, utilizing the United States mail and wires.

Stewart sold Summit and Equitable in 1993 for no consideration. In 1994, the companies were placed into liquidation in Pennsylvania.

The Liquidator sets forth twelve causes of action in her amended complaint against these various defendants. Counts 1 through 5 assert RICO violations under 18 U.S.C. § 1962(b), (c), and (d). Pursuant to § 1962(b) it is illegal for "any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b). An enterprise is broadly defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The enterprise here is SNLIC and "in the alternative," Equitable. The Liquidator alleges that acts of mail and wire fraud, specified in Exhibit F to the amended complaint, constituted racketeering activity. A pattern of racketeering activity arises when at least two acts of racketeering are committed within ten years of each other. 18 U.S.C. § 1961(5).

Section 1962(c) prohibits a person "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Conspiring to violate either of these sections is illegal under § 1962(d).

The remaining counts, 6 through 12, allege breach of fiduciary duty, negligence and malpractice, common law fraud, conversion, and imposition of a constructive trust, all under Pennsylvania law.

## II

■ In support of their motions to dismiss, defendants argue, among other issues, that the persons on whose behalf the Liquidator is suing do not have standing to pursue the RICO claims. Defendants contend that proximate cause does not exist between their alleged misconduct and any harm to those the Liquidator represents.[2]

■ According to the amended complaint, the Liquidator is suing on behalf of "creditors, members, policyholders or shareholders" of SNLIC and Equitable, pursuant to her statutory authority under Pennsylvania law.[3] She is not suing on behalf of SNLIC and Equitable themselves, which she characterizes as the RICO enterprises, not the victims.[4]

■ Despite her statement in the amended complaint, she cannot be suing on behalf of the members of SNLIC and Equitable since as stock companies they have none. Only mutual insurance companies have members. In addition, the Liquidator surely did not institute this action on behalf of the insolvent insurers' shareholders, for these are the very persons whom she is suing. Obviously, the Liquidator is not attempting to recover treble damages under RICO to benefit them. Therefore, we must focus on whether creditors and policyholders, the only other persons whom she claims to represent, have standing. For purposes of our analysis, creditors and policyholders are synonymous. In return for the payment of premiums, policyholders or their beneficiaries are entitled to their contractual benefits upon the happening of certain events. While policyholders may have a different priority than other creditors under a state liquidation statute, they are creditors nonetheless.

■ The section of the RICO statute allowing persons to pursue a civil action provides that:

> [a]ny person injured in his business or property *by reason of* a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c) (emphasis added).

The United States Supreme Court examined the standing requirement of this statutory provision in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). In that case, plaintiff Securities Investor Protection Corporation ("SIPC") sought to recuperate funds that it had paid to broker-dealer customers to cover the losses they endured when the broker-dealers, because of financial difficulties, became unable to meet their customers' claims. *Id.* at 261–62, 112 S.Ct. at 1314–15. SIPC sued 75 individuals who allegedly conspired in a fraudulent scheme which caused the financial demise of two broker-dealers. The scheme "result[ed] in their eventual liquidation and SIPC's advance of nearly $13 million to cover their customers' claims." *Id.*

**2.** Reliance by the alleged victims need not be alleged for RICO actions predicated on mail and wire fraud. *Tabas v. Tabas*, 47 F.3d 1280, 1294 n. 18 (3d Cir.), *cert. denied*, 515 U.S. 1118, 115 S.Ct. 2269, 132 L.Ed.2d 275 (1995).

**3.** The Pennsylvania statute states that the Liquidator has the power "[t]o prosecute any action which may exist on behalf of the creditors, members, policyholders, or shareholders of the insurer against any officer of the insurer, or any other person." Pa.Stat.Ann. tit. 40, § 221.23(13) (West 1992).

**4.** In her response to the defendants' motions to dismiss, the Liquidator asserts that her "statutory charge is to marshall assets on behalf of the insolvent estates of SNLIC and [Equitable]." Pls.' Omnibus Mem. of Law in Opp'n to the Mot. to Dismiss the First Am. Compl. at 5; *see also* Pl.'s Mem. of Law in Opp'n to the Mot. of Defs.' Morgan, Lewis & Bockius, LLP and David Harbaugh to Dismiss the First Am. Compl. at 13. But according to her amended complaint she is not suing on behalf of the corporations, but on behalf of their members, shareholders, creditors and policyholders. In a motion to dismiss, it is the complaint which controls. Moreover, in this RICO action, the Liquidator could not sue on behalf of victim corporations under § 1962(c) to the extent she is asserting that they were the enterprises through which the racketeering acts were conducted. Under § 1962(c) of RICO, the victim and the enterprise cannot be the same entity or person. *See National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 257–59, 114 S.Ct. 798, 804, 127 L.Ed.2d 99 (1994); *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 267 (3d Cir.1995).

at 262–63, 112 S.Ct. at 1315. *Id.* SIPC's complaint alleged that defendants' acts of mail and wire fraud constituted a "pattern of racketeering activity" under RICO such that plaintiff would be entitled to treble damages. *Id.* SIPC asserted that it sued on behalf of customers of the broker-dealer who did not buy or sell the stock Holmes, the lead defendant, allegedly manipulated. The District Court granted summary judgment in favor of Holmes due to lack of standing. While the Court of Appeals reversed the District Court, the Supreme Court in turn reversed the Court of Appeals.

The Supreme Court defined, "by reason of," the proximate cause language under § 1964, as requiring "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 268, 112 S.Ct. at 1318. It rejected an expansive "but for" test. *Id.* at 265–66 n. 10, 112 S.Ct. at 1316–17 n. 10. The Court observed that "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." *Id.* at 268–69, 112 S.Ct. at 1318. In concluding that SIPC did not have standing because the defendants did not proximately cause non-purchasing customers injury, it explained:

> the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers. That is, the conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims. Although the customers' claims are senior ... to those of the broker-dealers' general creditors, ..., the causes of their respective injuries are the same: The broker-dealers simply cannot pay their bills, and only that intervening insolvency connects the conspirators' acts to the losses suffered by the non-purchasing customers and general creditors.

*Id.* at 271, 112 S.Ct. at 1319. The Supreme Court noted that the broker-dealers, not their non-purchasing customers, were the

parties directly harmed, that is, the ones injured in their "business or property by reason of a violation of section 1962" of RICO. *Id.* at 273, 112 S.Ct. at 1320; *see* 18 U.S.C. § 1964(c).

Prior to the Supreme Court's pronouncement in *Holmes,* the Third Circuit defined the proximate cause necessary to sustain a civil claim under § 1962(a) of RICO. *See Brittingham v. Mobil Corp.,* 943 F.2d 297, 304 (3d Cir.1991). "[T]he RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence." *Id.* After *Holmes,* the Third Circuit addressed standing again in *McCarthy v. Recordex Service, Inc.,* 80 F.3d 842, 855 (3d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 86, 136 L.Ed.2d 42 (1996). In affirming the grant of summary judgment in favor of the defendant, it held that the same strict standing principles under the antitrust laws were also applicable under RICO. *Id.* Indirect purchasers cannot recover money damages under either. *Id.* In *McCarthy,* the plaintiffs were the clients of attorneys who had purchased copies of medical records from the hospital or its copy service company for use in their clients' personal injury lawsuits. *Id.* at 844. The clients alleged that the defendants conspired to charge excessive fees for the photocopies. *Id.* at 845. Because the lawyers, and not the clients, were the direct purchasers of the copies, the Third Circuit determined that the latter did not have standing under either the antitrust laws or RICO. *Id.* at 852–54. Clearly the clients were affected by any excess fees. Those who obtained a monetary recovery, through settlement or trial, had to reimburse their attorneys for any photocopy costs incurred during the lawsuit. *Id.* at 845–46. Higher charges meant a lower net recovery for the client. Nevertheless, this was not sufficient to establish a nexus between the harm caused by the makers of the photocopies and the injury suffered by the clients under § 1964 of RICO.

Since *Holmes,* several other Courts of Appeals have held that creditors, shareholders, and employees of an injured corporation do

not have RICO standing simply because of these relationships. *See Manson v. Stacescu,* 11 F.3d 1127, 1130–33 (2d Cir.1993), *cert. denied,* 513 U.S. 915, 115 S.Ct. 292, 130 L.Ed.2d 206 (1994); *Mid–State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1336–37 (7th Cir.1989). *See also Leach v. FDIC,* 860 F.2d 1266, 1273–74 (5th Cir.1988), *cert. denied,* 491 U.S. 905, 109 S.Ct. 3186, 105 L.Ed.2d 695 (1989). In *Manson,* plaintiff David Manson was a director, president and 50% shareholder of a construction company. *Manson,* 11 F.3d at 1129. He and co-plaintiff Mark Manson were also creditors of the company as personal obligors on funds loaned to the company. *Id.* Plaintiffs sued under RICO, alleging that 26 defendants, including company insiders, conducted a scheme to divert assets and funds from the company to enrich themselves, through a pattern of racketeering activity. *Id.* In support of their claim that they were personally injured by defendants' actions, plaintiffs pointed to the loss of their share of corporate earnings and profits, and to "injury to [their] reputation and business credit." *Id.* at 1129–30. In addition, they became personally liable on a loan which the company could no longer pay. *Id.* Despite these allegations, the Court of Appeals affirmed the district court's dismissal of the action. It held that under § 1964 of RICO the Mansons had no standing to sue, whether as creditors/obligors, or as shareholders, or as employees of the corporation.[5] *Id.* The damage alleged was not direct, but was "derivative of that of the corporation." *Manson,* 11 F.3d at 1130–31.

In *Mid–State,* the court reached the same result. There, plaintiffs were the managers and shareholders of a fertilizer company in financial trouble. *Mid–State,* 877 F.2d at 1333–34. They also acted as personal guarantors on loans extended to the company. *Id.* at 1334. Contending that a lender bank had breached certain loan agreements and caused the demise of the company, plaintiffs sought damages under RICO for injuries they themselves had suffered. *Id.* at 1334. As the Seventh Circuit recognized, "[plaintiffs'] wealth obviously was tied to Mid–State's success: to injure Mid–State was to wound the [plaintiffs]." *Id.* at 1335. Nonetheless, the court affirmed the grant of summary judgment for the defendants. The plaintiffs' injuries occurring after the financial ruin of their company were derivative and not direct. *Id.* If anyone was the victim and had a cause of action, it was the corporation and not the plaintiffs. *Id.* at 1335–36. It stated:

> When the injury is derivative, recovery by the indirectly-injured person is a form of double counting. 'Corporation' is but a collective noun for real people—investors, employees, suppliers with contract rights, and others. A blow that costs 'the firm' $100 injures one or more of those persons. If, however, we allow the corporation to litigate in its own name and collect the whole sum (as we do), we must exclude attempts by the participants in the venture to recover for their individual injuries.

*Id.*

We do not deny that policyholders and other creditors of SNLIC and Equitable could see themselves as victims of the alleged illegalities of the defendants as outlined in the amended complaint. Practically speaking, policyholders were essential to any such scheme because without their premiums, it probably would never have occurred. However, the test of proximate cause is not so broad.

In *Holmes,* the Supreme Court, in denying RICO standing to customers, explained "the conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims." *Holmes,* 503 U.S. at 271, 112 S.Ct. at 1319. Similarly, in

---

5. There are limited exceptions available, which are not applicable here. Creditors may sue under RICO when they have in fact sustained a direct injury. *Manson,* 11 F.3d at 1130. This may occur when a defendant has fraudulently conveyed property with the "direct purpose of insulating the corporation from its creditors."

*Id.; see also Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1100–01 (2d Cir.1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 1643, 104 L.Ed.2d 158 (1989). Shareholders may sue when they "sustain an injury that is separate and distinct from the injury sustained by the corporation." *Manson,* 11 F.3d at 1131.

this case, Stewart and the other defendants have allegedly injured the policyholders and other creditors only insofar as the siphoning off of assets injured SNLIC and Equitable and left them without the means to pay the policyholders' and other creditors' claims. *Id.; Manson,* 11 F.3d at 1130–33; *Mid–State,* 877 F.2d at 1336–37; *see also Leach,* 860 F.2d at 1273–74. "[O]nly that intervening insolvency connects the conspirators' acts to the losses suffered by the ... general creditors." *Holmes* at 271, 112 S.Ct. at 1319. *Holmes, Manson,* and *Mid–State* are compelling. These cases, in combination with the Third Circuit's decision in *McCarthy* that RICO standing is narrow, lead us to the conclusion that the Liquidator has no standing to bring this civil RICO action on behalf of the policyholders and other creditors of SNLIC and Equitable. *McCarthy,* 80 F.3d at 855–56. According to the amended complaint, SNLIC and Equitable were transformed "from financially healthy insurance companies into companies with millions of dollars in deficits." These are the entities that have suffered directly. In contrast, the losses of their policyholders and other creditors are indirect. The latter simply have not been injured in their "business or property **by reason of** a violation of section 1962." 18 U.S.C. § 1964(c) (emphasis added).

A further word is necessary. We cannot overlook the reality that many of the policyholders of SNLIC and Equitable may have suffered no loss at all, whether direct or indirect. The Liquidator obliquely concedes this point when she refers in the amended complaint to injury to "overburdened insurance guaranty funds." Pennsylvania has a Life and Health Guaranty Insurance Fund ("Guaranty Fund") which protects policyholders and beneficiaries who have an interest in life insurance policies issued by impaired or insolvent insurers.[6] With narrow exceptions, it pays up to $300,000 in death benefits, $100,000 in health insurance bene-

fits, and $300,000 in annuity benefits, per person when an insurer cannot meet its obligations. Pa.Stat.Ann. tit. 40 § 991.1703(c)(1) (West 1997). Other insurance companies, who are members of the Guaranty Fund, pay assessments to provide this protection. The Guaranty Fund is then subrogated to the rights and causes of action for those persons to whom it makes payments. *Id.* § 991.1706(m). Thus, to the extent that the Guaranty Fund protected any policyholder, he or she has incurred no injury whatsoever. Any damage suffered by the Guaranty Fund or its insurance company members is also indirect. It clearly does not satisfy the proximate cause requirement of *Holmes* and the other cases cited.

Finally, if the Liquidator is permitted to sue under RICO on behalf of the policyholders and other creditors, there will arise difficult ascertainment and apportionment of damages problems and the danger of double recoveries, particularly since the Liquidator seeks treble damages. The situation is further complicated by the involvement of the Guaranty Fund with its subrogation rights. These are the very difficulties that the courts seek to avoid by limiting the right to sue to those who have been directly injured. *See Holmes,* 503 U.S. at 269, 112 S.Ct. at 1318; *McCarthy,* 80 F.3d at 851–52; *Manson,* 11 F.3d at 1132; *Mid–State,* 877 F.2d at 1335–36.

### III

Accordingly, we will dismiss the Liquidator's RICO claims on the ground that she has failed to state a claim upon which relief can be granted. In so holding, we do not minimize the allegations which have been made here. We simply decide that RICO is not available to the Liquidator to remedy the situation. The Liquidator, of course, may proceed with her pendent state law claims in

---

6. Pennsylvania law provides for a life and health insurance guaranty association whose purpose is to protect beneficiaries, payees, or policyholders against failure in the performance of contractual obligations, under life and health insurance policies and annuity contracts ... because of the impairment or insolvency of the member insurer that issued the policies or contracts. To provide this protection, an association of insurers is created to pay benefits and to continue coverages as limited herein, and members of the association are subject to assessment to provide funds to carry out the purpose of this article.
Pa.Stat.Ann. tit. 40 § 991.1701, 991.1703 (West 1997).

the proper forum as well as any other remedies available under the various Pennsylvania insurance statutes. Our decision does not leave her without recourse.

Because the RICO claims were the only basis for federal jurisdiction, we will decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367 to review the Liquidator's state law claims. Therefore, we will also dismiss these claims.

In light of this court's decision, it is unnecessary to pass upon the other issues raised by the defendants in support of their motions to dismiss.

### ORDER

AND NOW, this 21st day of May, 1997, for the reasons set forth in the accompanying Memorandum, the motion of defendants Allen Stewart, David Harbaugh, Morgan Lewis & Bockius, Jeanne Fletcher, Nellie Morris, Lucille Werts Connors, Geoffrey Stewart, June O'Brien, Summit Company, American Insurance Managers, Inc., Bankers Equity Life Insurance Company, Bankers Equity Realty, Erin Group Administrator, Inc., Cathedral Life Insurance Company, Pacific Coast Underwriters, Inc., Covenant Realty, Ltd., Tartan Management Company, and Tsunami Corporation, to dismiss counts one through five of the amended complaint is hereby GRANTED under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

It is further ORDERED that this court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367 for the remaining state law claims. Those claims are DISMISSED without prejudice.