**Olin JONES, Plaintiff-Appellant,**

v.

**FORD MOTOR COMPANY, a corporation, Defendant-Appellee,**

**and**

**University Ford, Inc., and Maury Kemp, Defendants.**

**No. 77–1135.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Aug. 10, 1978.

Decided June 1, 1979.

William L. Lutz, Las Cruces, N. M., for plaintiff-appellant.

John P. Eastham, Albuquerque, N. M. (John P. Burton, Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, N. M., and Richard J. Molloy, Dearborn, Mich., with him on the brief), for defendant-appellee.

Before SETH, Chief Judge, LOGAN, Circuit Judge, and COOK, District Judge.*

LOGAN, Circuit Judge.

This appeal arises out of a suit brought by Olin Jones against Ford Motor Company, University Ford, Inc. and Maury Kemp, making claims based upon alleged violations of the antitrust laws, common law fraud, and Securities Exchange Commission's Rule 10b–5. Diversity of citizenship supports jurisdiction on the claim not based upon federal law. The trial court granted defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss the antitrust claim (Count I), on grounds that Jones lacked standing to assert it. Summary judgment was given against Jones on the common law fraud and Rule 10b–5 claims, based upon a finding that the applicable statute of limitations had run. This appeal challenges all three rulings, plus the refusal of the judge to permit an amendment to Count I on the antitrust claim.

Central to Jones' complaint are assertions that Ford Motor Company committed fraud to induce him to acquire a Ford dealership in Las Cruces, New Mexico in 1969 through the Ford dealer development program. As

* Of the United States District Court for the Eastern, Northern and Western Districts of Oklahoma, sitting by designation.

a result Jones invested $50,000 to purchase 500 shares of the common stock of a newly formed corporation, Olin Jones Ford, Inc.; Ford contributed $137,000, one-half to purchase 685 shares of $100 par preferred voting stock, and one-half in the form of a loan to the corporation represented by its promissory note. The money was used by the corporation to purchase the assets of the dealership from the prior owner and for working capital.

The contract, corporate articles and other documents made clear that the entire voting control of the corporation would vest in the preferred stock so long as any was outstanding. Jones was hired as president and general manager. The contract provided for bonus arrangements based upon profitability, specified in detail the method of paying off the loan made to the corporation and purchase of Ford's preferred stock by Jones out of bonuses and dividends, and dealt precisely with the use of corporate profits for dividends. Dissolution and buy out of Jones' interest were also covered, with a specification of priorities of preferred stock over common in case of dissolution, and paying Jones book value for his stock if his interest was terminated. Jones and two Ford Motor Company employees working with the dealer development program were elected to serve as directors and did so serve until Jones was discharged in April 1971 after twenty-one months operation of the dealership. When he was terminated Jones received $1 under the contract as payment in full for his shares of common stock, upon a finding by the accountant employed to review the books that his stock was worthless. The complaint at issue here was filed October 11, 1974, in federal district court.

Count I alleges violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15. It asserts that Ford Motor Company, incident to inducing plaintiff to purchase the Ford franchise in Las Cruces, caused Olin Jones Ford, Inc. to be created, took all voting stock of the corporation, elected a majority of the board of directors, and sold Jones non-voting stock for $50,000.

Thereafter Ford caused the new corporation to enter into an agreement with Jones for the dealership operation, with the aim of increasing its sales of new car units. It is then alleged that El Paso County, Texas, and Dona Ana County, New Mexico, constitute a single market for the sale of automobiles; Jones advertised on television in El Paso on behalf of the dealership; because of such advertising Maury Kemp (an El Paso car dealer) organized a boycott against the television station by most El Paso automobile dealers, boycotted the station and complained to Ford Motor Company that his market had been invaded, requesting Ford to prohibit plaintiff from advertising on El Paso television stations. Ford Motor Company, Olin Jones Ford, Inc., and Maury Kemp then allegedly entered into an agreement that Ford would direct that Jones cease all such advertising, restrict his sales to Dona Ana County, New Mexico, and no longer attempt to sell cars in competition with Maury Kemp's Ford agency in El Paso. When Jones refused to cease advertising, all defendants, acting through Ford's control of Olin Jones Ford, Inc.'s board of directors, fired Jones from his position, terminated his management contract, giving Jones only $1 for his $50,000 investment, and selling the dealership corporation to Kemp at a greatly reduced price. The agreement was asserted to be in furtherance of a plan to monopolize the sale of Ford products in El Paso County and Dona Ana County, New Mexico, all of which resulted in losses to Jones.

Count II is against Ford Motor Company alone, alleging common law fraud. It treats the inducement of Jones to undertake the Las Cruces dealership, the unconscionable nature of the contract, and seeks recovery of the $50,000 lost by Jones on his investment.

Count III against Ford Motor Company and University Ford, Inc. (successor to Olin Jones Ford, Inc.) is based on Rule 10b–5 (17 C.F.R. § 240.10b–5) promulgated under 15 U.S.C. § 78j. It asserts the inducements to Jones to purchase stock under representations that he would have full control and

operation of the corporation, would be able to purchase all outstanding stock and become sole owner, and would make large sums of money. It asserts the falseness of these representations, the absolute control by Ford, the making of untrue statements and omitting to state material facts with intent to deceive Jones, resulting in Jones' loss of his $50,000 investment.

A fourth claim asserted against Maury Kemp personally is not at issue on appeal, having been settled between the parties.

I

We treat first the standing issue with respect to the antitrust claims. Section 4 of the Clayton Act, 15 U.S.C. § 15, reads:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

The trial judge was of the view that despite Jones' casting the allegations in Count I as injury to his property and business personally, in reality it alleges injury to Olin Jones Ford, Inc., the business entity which operated the dealership. Reliance is placed upon the references to advertising on television in El Paso, which may have been ordered by Jones but was in the name and on behalf of the dealership corporation. A conspiracy to monopolize automobile sales in the two-county area would be to the detriment of the Las Cruces dealership corporation as the business entity which suffers.

It is settled law that shareholders and employees do not have standing to sue for antitrust violations that injure a corporation. This Circuit has recognized the general rule in *Reibert v. Atlantic Richfield Company*, 471 F.2d 727 (10th Cir.), *cert. denied*, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973). *See also, Nationwide Auto Apprais-er Serv., Inc. v. Association of Cas. and Sur. Cos.*, 382 F.2d 925 (10th Cir. 1967). The reasoning behind the rule is well stated in *Martens v. Barrett*, 245 F.2d 844, 846 (5th Cir. 1957), as follows:

A claim for treble damages, as is this one, originates in Section 4 of the Clayton Act, 15 U.S.C.A. § 15. By it, this punitive sanction in enforcement of the statutory Anti-trust policy, is limited to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." A corporation is a "person," 15 U.S.C.A. § 12. And it is universal that where the business or property allegedly interfered with by forbidden practices is that being done and carried on by a corporation, it is that corporation alone, and not its stockholders (few or many), officers, directors, creditors or licensors, who has a right of recovery, even though in an economic sense real harm may well be sustained as the impact of such wrongful acts bring about reduced earnings, lower salaries, bonuses, injury to general business reputation, or diminution in the value of ownership. (Footnotes omitted.)

While Section 4 of the Clayton Act was worded broadly to effect Congress' intentions to encourage sanctions against antitrust violations wherever possible, the right of action is limited to those directly injured by the anti-competitive behavior. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Thus, even though there are losses of a job with a corporation and upon an investment in stock this is not regarded the direct injury against which the treble damages action was aimed. *Reibert, supra*, 471 F.2d at 731, discussed this principle as follows:

In *Peterson v. Borden Co.*, supra, [50 F.2d 644 (7th Cir. 1931)] stockholders were allegedly fraudulently induced to sell their stocks to majority stockholders for less than its value. Subsequently the majority stockholders sold the entire assets to a corporate competitor. The minority stockholders sued to recover damages for injury to their property caused by alleged

violations of the antitrust laws resulting from the sale of stock by majority stockholders to a competitor. The court denied recovery because a stockholder of an absorbed corporation who parts with his stock for less than its actual cash value cannot attribute his loss to substantial lessening of competition or creation of a monopoly. Any injury sustained is through fraud by majority stockholders, not lessening of competition.

Jones relies on a series of cases to support his assertion that his employment and investment is sufficient for standing under Section 4 of the Clayton Act. *Reibert, supra*, distinguished virtually every case relied upon by Jones, reasoning that the plaintiffs in those cases

> in essence were quasi-businessmen operating in a market carved out by their own aggressiveness and salesmanship qualities. Thus when their employers engaged in anti-competitive practices, the employees were directly injured by these violations.

*See Dailey v. Quality School Plan, Inc.*, 380 F.2d 484 (5th Cir. 1967); *Nichols v. Spencer Int'l Press, Inc.*, 371 F.2d 332 (7th Cir. 1967); *Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *Roseland v. Phister Mfg. Co.*, 125 F.2d 417 (7th Cir. 1942).

There are two decisions involving automobile dealerships. One, involving Ford Motor Company and an arrangement similar to the one at issue here, found no cause of action where the suit was by the individual. *Wobb v. Ford Motor Co.*, 76 F.R.D. 452 (W.D.Pa.1977). Ruling the other way was *Kolb v. Chrysler Corp.*, 357 F.Supp. 504 (E.D.Wis.1973). We believe that the distinction made by *Wobb* which we recognized in *Reibert*, is a valid one. Insofar as there is an antitrust violation, a combination in restraint of trade, the injury is to the business itself. The business has always been operated by the corporate entity, Olin Jones Ford, Inc. (now Universal Ford, Inc.). Count I of the complaint may be read to allege a conspiracy on behalf of Ford Motor Company and Maury Kemp

against Jones personally to freeze him out of the dealership and to deprive him of the benefits of his investment in the corporate stock. But that is not an antitrust violation. Rather it is common law fraud, or possibly a violation of Rule 10b–5, covered by other counts in his complaint.

■ Therefore we affirm the court's dismissal of Count I on the ground that Jones does not have standing to assert it. Likewise we hold the trial court did not err in refusing to permit amendment to the antitrust count.

## II

The briefs on appeal contain much discussion of whether a two-year or four-year statute of limitations applies to the Rule 10b–5 action asserted in Count III of the complaint. Since the federal statute does not contain a limitations period we look to state law, here New Mexico. Jones argues that we declared in *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 494 F.2d 168 (10th Cir. 1974), if there is a viable issue of fact as to when the limitations period began summary judgment is not proper. This Court has applied the longer statute of common law frauds (here four years) rather than the shorter time limit of state securities acts in these types of cases. *deHaas v. Empire Petroleum Co.*, 435 F.2d 1223 (10th Cir. 1971); *Chiodo v. General Waterworks Corp.*, 380 F.2d 860 (10th Cir. 1967). Ford, on the other hand, argues that N.M.Stat.Ann. § 48–18–31(a) (1953), setting a two-year statute of limitations for fraud in connection with the sale of a security should be applied, citing *Vanderboom v. Sexton*, 422 F.2d 1233 (8th Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970). The trial judge found the two-year statute applicable.

In view of our disposition of the common law fraud issue, *infra*, and the trial court's express finding that the statute of limitations has run even if the four-year fraud statute is applied to Rule 10b–5 actions, we do not have to decide this issue and decline to do so.

### III

■ As to the common law fraud alleged in Count II, the parties acknowledge a four-year limitations period applies. N.M.Stat. Ann. § 23–1–4 (1953). It commences to run upon discovery of the fraud, or as stated in *Romero v. Shanchez*, 83 N.M. 358, 492 P.2d 140 (1971), upon discovery of such facts as would, on reasonable diligent investigation, lead to a knowledge of fraud.

Thus, the statute of limitations commences to run from the date Jones acquired actual knowledge of the fraud. But even absent actual knowledge, a reasonable person standard will be applied as to whether he should have known of the fraud, in which case the difficulty of the case and the complexity of the facts, combined with his degree of sophistication, becomes the test. *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 494 F.2d 168 (10th Cir. 1974).

At the hearing on the summary judgment motions, the court declared "I read those depositions of the defendant [sic] and not once but many times he testified about knowing that he was going down the tubes." After reading and reviewing Jones' deposition, we agree.

The gravamen of Jones' allegations of common law fraud and his 10b–5 claim is that he was told he would have "sole and exclusive control of the operation" of the dealership, and Ford made optimistic projections. His deposition is clear, however, that Ford accountants audited and had the final say over his books, and that such control was asserted as early as the second month he was in operation; at no time did he have control over the financial statements of the business. The deposition further demonstrates that Jones did in fact run the day-to-day operation, and at no time was forced to hire or fire anyone, but Ford employees suggested and at times urged that he make employee changes.

Jones claimed that he did not read the Dealer Development Contract until after the purchase was made and he had been in operation for several months. But he was involved in the ownership of another Ford dealership prior to purchasing this one and had been in the automobile business for years. While he may not have fully understood the distinction between preferred and common stock, the written contract, corporate articles of incorporation and all of the other documents clearly outline precisely the control arrangement, who had voting control, and the precise use of any profits. A reasonable person would have read and been knowledgeable of these controls, which were made very apparent to him by his own admission long before October 1970.

The essence of his claim of fraud is that the company was optimistic with him, giving projections of a rosy profit picture, that no dealer had ever failed and that he was bound to make money and be able to buy them out soon. His contention is that he never discovered the falsity of these representations until the company ousted him in April 1971, forcing him to take the book value of his shares, which stock was worthless considering that all losses the corporation had sustained were allocated against the common stock.

Jones argues, properly, that since this was summary judgment his allegations of fraud must be construed most favorably to him. *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33 (10th Cir. 1975). He declares that his affidavit in opposition to the motion for summary judgment must be considered along with his deposition, and that in his affidavit he denies knowledge of the fraudulent scheme prior to his ouster in April 1971. But the trial judge had the right to look beyond the affidavit to his deposition.

Jones was asked, in his deposition, when he knew he did not have sole and exclusive control of the operation. He responded:

A  I wouldn't say that in three or four months that I did. I would say just a little bit at a time, until towards the end of 1970, I really knew that all I had done is bought a job and I could be fired from it.

Q  What did you feel in early 1970, when they were after you with the used-car writedowns?

A  I didn't feel good about it, really. I objected to it and tried to overcome it, but I wasn't able to.

Q  You knew at that time you certainly didn't have sole and exclusive control of the business?

A  Yes. More and more as we went on, I never had control. I even had to ask permission to build a used-car office or to buy anything that cost over five hundred dollars.

Q  You knew that fairly quickly?

A  Yes. I requested the used-car office and was turned down.

Q  So you knew virtually as soon as you started that you didn't have sole and exclusive control?

A  No, I wouldn't say virtually as soon as I started. I would say that I knew this at the beginning of 1970.

In another series of questions it appears he knew that Ford wanted him out and that his stock would be valued at nothing in July 1970:

A  It was in a conversation, like about the advertising, something else, and I mentioned going to it. I was just told that they didn't think I should go. Of course, at that time I think they had already started preparing their files for cancellation.

Q  Well, you recall a meeting held—and I'll be going into this in more detail later—but there was a meeting held in Phoenix on about July 29th, when somebody suggested that you resign?

A  General things, on our way back from the airport, from the El Paso airport to Las Cruces, asked if I would resign. And I asked if I had resigned, how much would I be given for my interest in the dealership, and he said nothing, and I said, "I will not resign."

Q  Didn't he say a dollar?

A  No, he did not say a dollar.

In view of these admissions and the exhibits, including income tax returns and letters directed to him from Ford, all in the record and dated prior to October 11, 1970, there can be no question but that Jones was on notice, more than four years before his lawsuit, that any representations made to him about the sure profitability of the dealership, and his control over it, were false. The trial judge properly discredited his affidavit that he did not know of the falsehoods until sometime after October 11, 1970.

The judgment is affirmed.