MID–STATE FERTILIZER CO., Lasley Kimmel, and Maxine Kimmel, Plaintiffs–Appellants,

v.

EXCHANGE NATIONAL BANK OF CHICAGO, et al., Defendants–Appellees.

No. 88–2532.

United States Court of Appeals, Seventh Circuit.

Argued April 18, 1989.

Decided June 19, 1989.

Thomas E. Leiter, Leiter, Brady & Associates, Peoria, Ill., Douglas A. Antonik, David M. Raymond, Mount Vernon, Ill., for plaintiffs-appellants.

David L. Piercy, Howard & Howard, Mount Vernon, Ill., David N. Missner, Franklin S. Schwerin, Angel Rodriguez, Schwartz, Cooper, Kolb & Gaynor, Chicago, Ill., for defendants-appellees.

Before COFFEY, EASTERBROOK, and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Mid–State Fertilizer Co. sold fertilizer in mid-state Illinois. It needed money to buy supplies, pay its workers, and run the business until it could collect from customers. Mid–State arranged for revolving credit from the Exchange National Bank of Chicago, which promised to lend Mid–State 70% of its inventory and receivables to a maximum of $2 million; Mid–State promised to direct its customers to make all payments to a postal box that Exchange would control (the "lock box"). Exchange

would retrieve the checks and deposit them to an account from which it alone could withdraw cash (the "blocked account"). After the instruments cleared, Exchange applied the money to pay amounts due on the loan; anything left over Exchange would deposit to Mid–State's operating account. Exchange also deposited advances into the operating account when notified by Mid–State that new inventory was available for sale. So Mid–State received money both from advances and from the excess of receivables over what was necessary to repay the bank. Exchange's arrangement with Mid–State was a variant of factoring, which banks call "asset-based financing". See Grant Gilmore, 1 *Security Interests in Personal Property* 129–33 (1965). Unlike traditional factoring, this arrangement did not shift to the lender the risk of customers' defaults. Mid–State remained liable for the full amount of any loan; Exchange also took guarantees from Lasley and Maxine Kimmel, Mid–State's sole shareholders.

In December 1985 Mid–State gave Exchange a financial statement showing that it had lost between $200,000 and $300,000 in the preceding year. Concerned about the soundness of its borrower, Exchange limited the amount of fertilizer in transit that would count as "inventory" for the purpose of new advances. By May 1986 Mid–State was in default. Exchange spoke with some of Mid–State's customers and discovered that a receivable Mid–State had represented to be worth $135,000 did not exist. Exchange soon stopped making new advances to Mid–State and contacted all of Mid–State's customers, demanding that they send payments to the lock box. It discovered in the process that customers had paid $1 million direct to Mid–State, bypassing the lock box and increasing the bank's risk. Unable to find new financing, Mid–State crumpled. It is now in liquidation under Chapter 7 of the Bankruptcy Code.

Mid–State commenced this suit, joined as plaintiff by the Kimmels. Their principal

grievances arise under state law. Mid–State contends that Exchange broke its contract by refusing to make additional advances and by collecting all of the receivables even after declining to loan more money. But there is no basis of federal jurisdiction over these claims, as all parties are citizens of Illinois. To get into federal court the plaintiffs needed a federal claim.* They picked two: the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(a) and 1964(c), and the anti-tying provisions of the Bank Holding Company Act (BHCA), 12 U.S.C. §§ 1972 and 1975. Plaintiffs portrayed the bank's repeated failure to apply the money in the blocked account to reduce the loan the same day funds became available as a "pattern" of "fraud", allowing recovery under RICO; they depicted the lock box as a banking service "tied" to the advances in violation of the BHCA.

The district court granted Exchange's motion for summary judgment on the federal claims, dismissing the pendent claims without prejudice. 693 F.Supp. 666 (N.D. Ill.1988). Although concluding that the Kimmels, as guarantors of Mid–State's loans, could sue under both RICO and the BHCA, it rejected all claims on the merits. Delay in crediting money against the loans could not be "fraud", the district judge reasoned, when the bank sent statements showing what it was doing. Linking the lock box to the loan was not tying, as the judge saw things, but was only what a prudent bank would demand to control its risk; Mid–State was free to withdraw the sums in the operating account and use another bank for its daily business.

I

■ Exchange reiterates an argument that did not persuade the district court: that the Kimmels are not entitled to recover under RICO and the BHCA. Both statutes authorize litigation by "[a]ny person who is injured in his business or property

---

* Claims under state law might be appropriate "adversary proceedings" in Mid–State's bankruptcy, but none of the parties mentions this possibility, so we let the matter drop. Likewise we bypass the fact that Mid–State's trustee in bankruptcy has not been named as the plaintiff. Counsel assured us at oral argument that the trustee has approved this litigation.

by reason of anything forbidden in ...". 12 U.S.C. § 1975; 18 U.S.C. § 1964(c) (which modifies the language slightly to "by reason of a violation ...". This business-or-property formula tracks § 4 of the Clayton Act, 15 U.S.C. § 15, the damages provision of the antitrust laws. Both this court, *Carter v. Berger*, 777 F.2d 1173 (7th Cir.1985) (dealing with RICO), and other courts, e.g., *Sundance Land Corp. v. Community First Federal Savings & Loan Ass'n*, 840 F.2d 653, 659–61 (9th Cir. 1988) (an anti-tying provision of the banking laws), have noticed the identity and held that the rules established in anti-trust cases for identifying the proper plaintiffs should be applied to RICO and the BHCA too.

Lasley and Maxine Kimmel were the managers and shareholders of Mid–State. They guaranteed its obligations to Exchange. Their wealth obviously was tied to Mid–State's success: to injure Mid–State was to wound the Kimmels. Equally obviously, the Kimmels' injury was derivative. Investors gain or lose with the firm; stockholders receive what's left after the corporation pays its debts. Lenders (guarantees are a form of contingent loan) also gain or lose with the firm, although lenders have more protection than equity investors. Employees, too, invest in the firm: they invest their human capital. If that capital is specialized—that is, if it is worth more when used in connection with the employer than doing something else—the employee is an "investor" to the extent of that specialization. If the employee's skills are not tied to the firm, so that the employee can go elsewhere and make as much, then there is no "investment", no loss in the event the firm collapses. Unspecialized employees, like the suppliers of gasoline and typewriters, can turn elsewhere and still earn a market return. In all of these roles—as equity investors, as debt investors (guarantors), and as human capital investors (managers)—the Kimmels gained and lost with Mid–State. A blow costing Mid–State $1 could not cost the Kimmels more than $1. An award putting the $1 back in Mid–State's treasury would restore the Kimmels to their former position.

The derivative nature of such injuries leads courts in antitrust cases to hold that neither investors nor employees may recover. E.g., *In re Industrial Gas Antitrust Litigation (Bichan)*, 681 F.2d 514 (7th Cir. 1982), and, in other courts, *Bubar v. AMPCO Foods, Inc.*, 752 F.2d 445 (9th Cir.1985); *Meyer Goldberg, Inc. v. Fisher Foods, Inc.*, 717 F.2d 290 (6th Cir.1983); *In re Municipal Bond Reporting Antitrust Litigation*, 672 F.2d 433 (5th Cir.1982); *Jones v. Ford Motor Co.*, 599 F.2d 394 (10th Cir.1979). RICO and bank tying cases have followed the path blazed in antitrust. See, in addition to *Sundance Land,* cases such as *Rose v. Bartle*, 871 F.2d 331, 357–58 (3d Cir.1989) (RICO); *Ocean Energy II, Inc. v. Alexander & Alexander, Inc.*, 868 F.2d 740, 744–46 (5th Cir.1989) (RICO); *Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440 (5th Cir.1986) (bank tying); *Parsons Steel, Inc. v. First Alabama Bank*, 679 F.2d 242 (11th Cir.1982) (bank tying) (a subsequent decision in this case was reversed on other grounds, 474 U.S. 518, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986)); *Costner v. Blount National Bank*, 578 F.2d 1192 (6th Cir.1978) (bank tying). Antitrust, RICO, and bank tying cases are not off by themselves in a corner. It is commonplace to rebuff efforts by investors and employees to collect damages for injuries done to their firms. E.g., *Kush v. American States Insurance Co.*, 853 F.2d 1380 (7th Cir.1988); *In re Deist Forest Products, Inc.*, 850 F.2d 340 (7th Cir.1988). A big chunk of the law concerning corporate derivative litigation consists in separating "direct" injury (which the investor may redress through independent suit) from "derivative" injury (which the investor may redress only through litigation in the name of the corporation). The Kimmels' injury is derivative no matter which body of rules we consult.

Good reasons account for the enduring distinction between direct and derivative injury. When the injury is derivative, recovery by the indirectly-injured person is a form of double counting. "Corporation" is but a collective noun for real people—investors, employees, suppliers with contract

rights, and others. A blow that costs "the firm" $100 injures one or more of those persons. If, however, we allow the corporation to litigate in its own name and collect the whole sum (as we do), we must exclude attempts by the participants in the venture to recover for their individual injuries. A fire that causes $100 worth of damage to "the corporation", and therefore reduces the value of investors' stock by $100, does not cause a total injury of $200 —the net loss is $100, and everyone is made whole by an award of that sum to the firm. To avoid double counting courts must either restrict recoveries to the directly-injured party or attempt to apportion the recovery according to who bears the effects: say, $60 to equity investors, $20 to debt investors, $10 to employees with specialized skills, § 10 to persons who leased property to the firm. Divvying up the recovery would be a nightmare, making the task of awarding damages to "indirect purchasers" in antitrust law easy by comparison. See *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *Carter v. Berger.* Why undertake such a heroic task when recovery by the firm handles everything automatically?— for investors, workers, lessors, and others share any recovery according to the same rules that govern all receipts. Recovery by the firm, followed by division according to entitlements, is especially important when the firm has landed in bankruptcy. Suits by shareholders, guarantors, and the like may well be efforts to divert the debtor's assets—to pay off one set of creditors (here, the Kimmels) while keeping the proceeds out of the hands of the firm's other creditors.

The district court recognized that shareholders, creditors, managers, lessors, suppliers, and the like cannot recover on account of injury done the corporation. It believed that guarantors are different, and that because the Kimmels are guarantors they also may recover as stockholders. 693 F.Supp. at 669. Why should that be so? The participants most directly affected by injury inflicted on the firm are the stockholders—for their investment is first to be wiped out. Creditors come next.

Guarantors are contingent creditors. If the firm stiffs a creditor, that creditor can collect from the guarantor; the guarantor succeeds to the original creditor's claim against the firm. We know that creditors cannot recover directly for injury inflicted on a firm, so guarantors as potential creditors likewise cannot recover.

One could say that guarantors are different because they may deal directly with the wrongdoer. The Kimmels' guarantees were contracts between them and Exchange. But direct *dealing* is not the same as direct *injury*. The Kimmels do not contend that Exchange broke the contracts by which the Kimmels guaranteed Mid–State's borrowings. They say, rather, that Exchange violated statutory and contractual duties owed to Mid–State, which caused them derivative injury as guarantors. Recovery by Mid–State would put the Kimmels in the position they would have occupied had Exchange lived up to its promises. There is therefore no reason other than a semantic one to treat guarantors differently from debt investors in the firm, and semantics (even if glorified as semiotics or hermeneutics) is not good enough.

*Swerdloff v. Miami National Bank*, 584 F.2d 54, 58–60 (5th Cir.1978), on which the district court relied, does not make the derivative nature of the injury irrelevant. *Swerdloff* says that no unyielding rule confines recovery under the bank tying laws to the bank's customer. See. also *Campbell*, 781 F.2d at 442. It does not go to the other extreme and hold that anyone who has dealt with a bank as guarantor may recover for derivative injuries. *Continental Illinois National Bank v. Stanley*, 585 F.Supp. 1385 (N.D.Ill.1984), extended *Swerdloff* in this way, and it erred in doing so. We disapprove *Stanley* and the reasoning of the district court in our case allowing the Kimmels to litigate. To the extent *Swerdloff* supports *Stanley*, its sails were trimmed in *Campbell*. Guarantors must be treated as creditors. When they suffer direct injury—injury independent of the firm's fate—they may pursue their own remedies. Those whose injury is derivative must take their place in line as

creditors in the bankruptcy action (or outside of it), dependent now as before on the success of the firm in which they invested.

## II

■ Mid–State, the remaining plaintiff, contends that Exchange violated § 1962(a) of RICO by perpetrating a pattern of fraud and investing the proceeds in itself. The fraud Mid–State perceives lies in the bank's lassitude in crediting monies to the loan. Exchange committed itself to check the blocked account every morning in order to determine which checks deposited to it had been paid; as soon as funds were available, Exchange promised to use the proceeds to reduce the balance of the loan—saving Mid–State interest charges and releasing some funds to the operations account. The bank did not apply the funds in the blocked account in a timely fashion. Exchange sometimes waited a day to move the money after the checks had cleared, enjoying the value of the float. Therein lies the fraud, Mid–State says. By surreptitiously delaying the transfer, Exchange enriched itself by the time value of the money.

Two inconvenient facts, revealed by the record on summary judgment, cut this claim short. First, the bank did not act surreptitiously. It rendered timely statements to Mid–State showing when it applied funds from the blocked account. Nothing was concealed. Second, deceit (if we take this to be deceit) is not "fraud" unless material. Mid–State knew about the tarrying when it negotiated an extension of the loan. If Mid–State did not think delay material then—it deemed the delay "not that big a problem"—it cannot change its view now. Commercial transactions commonly allow for problems of this sort. The interest Exchange earned on the deferred credits comes to less than $5,000 over the life of the loan; Mid–State, knowing of the occasional delays, could have bargained for a fractionally lower interest rate or quicker extension of credit against inventory—maybe it did these things and has been "compensated" in advance for the delay. The income Exchange earned on the float was worth about one-quarter of

one percent in interest on the loan, a simple adjustment to make. Anyway, to break a promise is not to commit fraud. Mid–State equates the two without support. We therefore agree with the district court's conclusion, 693 F.Supp. at 673–74, that Exchange is entitled to summary judgment on the RICO claims.

## III

■ The several bank anti-tying statutes forbid linking credit to other services. Section 1972(1), in which Mid–State seeks refuge, says that a bank "shall not in any manner extend credit ... on the condition or requirement—

(A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service; ...

(C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service; ...

(E) that the customer shall not obtain some other credit, property, or service from a competitor of such bank ... other than a condition or requirement that such bank shall reasonably impose in a credit transaction to assure the soundness of the credit."

Mid–State believes that the lock box and blocked account are banking services impermissibly tied to the loan. Section 1972(1)(A) falls out immediately because the lock box and blocked account are "deposit ... service[s]", but it is not so easy to grant summary judgment on claims under § 1972(1)(C) and (E). These allow banks to require customers to use services "usually provided in connection with a loan", § (1)(C), and those "reasonably impose[d] ... to assure the soundness of the credit", § (1)(E), both of which sound like factual questions. Mid–State tendered an affidavit (on which more below) putting these things in issue, and it says it is entitled to a trial. To this Exchange responds that lock boxes are common in asset-based financing and that after the lock box had served its pur-

pose Mid–State could withdraw money from the operations account and do its day-to-day banking anywhere it pleased (it actually had an account with another bank), negating the argument that the loan had been tied to other banking services.

The practices at hand—tying and reciprocity—are familiar in antitrust law. Section 3 of the Clayton Act, 15 U.S.C. § 14, which explicitly addresses tying, contains a limitation missing in the banking statutes: under the Clayton Act a tie-in sale is unlawful only if the effect "may be to substantially lessen competition or tend to create a monopoly in any line of commerce." The omission in the banking laws has not prevented courts from seeing, however, that it is all but impossible to define a "tie" apart from inquiry into competitive conditions. Almost anything could be called a tie-in. Maybe the loan is "tied" to the demand that it be repaid; maybe the refusal to lend less than $1 million could be called a tie-in of one $500,000 loan to a second. There must be a benchmark. As the Supreme Court observed in *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 11–12, 104 S.Ct. 1551, 1557–58, 80 L.Ed.2d 2 (1984), one seller's insistence on packaging its goods and services cannot cause injury, cannot even usefully be called a tie-in, if there are many other sellers, and these others offer unbundled products. Even then there is no "tie" unless there are separate demands for the two products. *Id.* at 21–22, 104 S.Ct. at 1562–63. See also *Jack Walters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698, 703–05 (7th Cir.1984). We doubt that Exchange National Bank of Chicago has market power (especially not in mid-state Illinois); we doubt that there is a demand for "lock boxes" and "blocked accounts" separable from the demand for asset-based loans (who goes out shopping for a "blocked account" as a separate product?). So to the extent the bank tying statutes track antitrust law—which is considerable, although not total, see *Davis v. First National Bank of Westville*, 868 F.2d 206 (7th Cir. 1989); *Exchange National Bank v. Daniels*, 768 F.2d 140, 143 (7th Cir.1985)—Mid–State has a tough row to hoe.

Unfortunately, however, the record in this case was assembled before *Davis* clarified the congruence of bank-tying law with its antitrust cousin. The district judge did not inquire whether Exchange's practices were "anticompetitive" in the sense antitrust law uses that term; instead the court held that Mid–State had not demonstrated a genuine issue of material fact about whether the lock box and blocked account were customary services, reasonably employed to "assure the soundness of the credit." Exchange filed affidavits avowing that such requirements are both common and necessary when dealing with small businesses in volatile agricultural markets. Mid–State furnished a contrary affidavit. Judge Hart concluded that Mid–State's affidavit does not establish a genuine issue of material fact, 693 F.Supp. at 669–70.

Mid–State's affidavit came from William R. Bryan, Chairperson of the Department of Finance at the University of Illinois in Urbana and author of more than a dozen articles on banking (together with many on other subjects) since he received his Ph.D. from the University of Wisconsin in 1961. Professor Bryan served five years as an economist at the Federal Reserve Bank of St. Louis before entering the academy, and while at the University of Illinois he has moonlighted on the boards of directors of three banks—including, from 1974 to 1977, the Exchange National Bank of Chicago. Editor of the Illinois Business Review since 1977, Professor Bryan signed an affidavit which reads in full (omitting formal matters):

3. I have reviewed various pleadings, depositions and documents, which include documents and records provided by the Exchange National Bank during discovery.

4. In my opinion the loan arrangement, which included a locked box or blocked account, in this case was not necessary to assure repayment of the loan by Mid–State.

5. It is my opinion that the loan arrangement, which included a locked box or blocked account, in this case was not

necessary to assure the soundness of the credit extended to Mid–State.

6. In my opinion the handling of the loan arrangement and use of the locked box or blocked account by the Exchange National Bank was not an appropriate traditional banking practice.

7. In my opinion the handling of the loan arrangement and use of the locked box or blocked account by Exchange National Bank personnel was contrary to good faith and fair dealing.

8. Further, it is my opinion that the handling of the loan arrangement and use of the locked box or blocked account by Exchange National Bank personnel was such that the likely and predictable result was the demise of Mid–State as a going concern.

9. That my opinions set forth herein are based on my education, training, experience, as well as my review of the documents, pleadings and other information provided to me to date.

The district court thought this affidavit insufficient because Professor Bryan "does not recite any of the specific facts or steps in his reasoning". 693 F.Supp. at 670.

Rule 705 of the Federal Rules of Evidence allows experts to present naked opinions. Admissibility does not imply utility. Professor Bryan presented nothing but conclusions—no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected. Rule 56(e) of the Rules of Civil Procedure provides that affidavits supporting and opposing motions for summary judgment must do more than present something that will be admissible in evidence. They shall "set forth facts" and by implication in the case of experts (who are not "fact witnesses") a process of reasoning beginning from a firm foundation. *American Key Corp. v. Cole National Corp.*, 762 F.2d 1569, 1579–80 (11th Cir.1985). "It will not do to say that it must all be left to the skill of experts. Expertise is a rational process and a rational process implies expressed reasons for judgment." *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 627, 64 S.Ct. 281, 299, 88 L.Ed. 333 (1944) (Frankfurter, J., dissent-

ing). An "opinion has a significance proportioned to the sources that sustain it." *Petrogradsky Mejdunarodny Kommerchesky Bank v. National City Bank*, 253 N.Y. 23, 25, 170 N.E. 479, 483 (1930) (Cardozo, J.). An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process. See *Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823, 829–32 (D.C.Cir.1988), holding that an expert's declaration, full of assertion but empty of facts and reasons, won't get a case past a motion for summary judgment, for the judge must "look behind [the expert's] ultimate conclusion ... and analyze the adequacy of its foundation." *Id.* at 829. See also *Washington v. Armstrong World Industries, Inc.*, 839 F.2d 1121 (5th Cir.1988); *Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5th Cir.1987). Professor Bryan would not accept from his students or those who submit papers to his journal an essay containing neither facts nor reasons; why should a court rely on the sort of exposition the scholar would not tolerate in his professional life?

Why, especially, when the declaration makes no sense. Professor Bryan asserts that a lock box system for realizing on the collateral of a loan is "not an appropriate traditional banking practice" and "that the likely and predictable result [of the practice] was the demise of Mid–State as a going concern." This accuses the bank of irrational conduct—not a common assumption for an economist. Why would Exchange National Bank assassinate one of its customers? Banks can't make money by digging their customers' graves. Why would a customer queue up for the slaughter? Anyway, how can payments from customers direct to the bank not be "traditional" when that is the cornerstone of factoring and asset-based lending? *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), shows that "if the factual context renders [the] claim implausible—if the claim is one that simply makes no economic sense—[the plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary."

Bryan might have been able to demonstrate that his conclusions rest on a sound foundation even though they appear fantastic, but he did not try.

Indeed, nothing in the affidavit draws on the skills of an economist. Insights into "good faith and fair dealing" are no part of the economist's armamentarium—certainly not when expressed without regard to risk and the rate of interest on the loan (compared with, say, the rate for other similarly risky loans that are less-well secured). Economics is the study of rational, self-interested accommodation to scarcity. Bryan as *economist* might have discussed whether banking markets available to Mid–State are competitive, whether security devices such as lock boxes reduce defaults and so allow banks to lend at lower rates (and, if so, whether Mid–State received an adjustment implied by the change in risk, in light of the competitive rate of interest then prevailing). An economist could have developed a model of the relation between risk-reduction devices and the rate of interest and analyzed where Mid–State fell in comparison to other borrowers, or where Exchange fell in comparison to other lenders. Bryan did none of these things. Instead he examined materials produced in discovery and drew inferences from the record, speaking in legal rather than economic terms. He gave a legal rather than an economic opinion. George J. Stigler, *What Does an Economist Know?*, 33 J. Legal Ed. 311 (1983).

Bryan offered the court his CV rather than his economic skills. Judges should not be buffaloed by unreasoned expert opinions. Paul Meier, *Damned Liars and Expert Witnesses*, 81 J.Am.Statistical Ass'n 269 (1986). Judge Hart was not. We have gone into detail not because essential to sustain his decision but because ukase in the guise of expertise is a plague in contemporary litigation. "The importance of safeguarding the integrity of the [judicial] process requires the trial [or appellate] judge, when he believes that an expert's testimony has fallen below profes-

sional standards, to say so, as many judges have done." *Deltak, Inc. v. Advanced Systems, Inc.*, 574 F.Supp. 400, 406 (N.D.Ill. 1983), vacated on other grounds, 767 F.2d 357 (7th Cir.1985). See also Learned Hand, *Historical and Practical Considerations Regarding Expert Testimony*, 15 Harv.L. Rev. 40 (1901). Professor Bryan cast aside his scholar's mantle and became a shill for Mid–State; Judge Hart, by observing that the emperor has no clothes, protected the interests of the judicial system.

AFFIRMED.

RIPPLE, Circuit Judge, concurring.

I join the judgment of the court and in the essential reasoning of the majority opinion. I write separately only with respect to three points. First, I believe that the majority is quite right in concluding that, under the circumstances presented here, the Kimmels have alleged only derivative injury as guarantors and therefore do not have standing to bring either a RICO or a Bank Holding Company Action. On the other hand, as the Fifth Circuit pointed out in *Swerdloff v. Miami National Bank*, 584 F.2d 54, 58–59 (5th Cir.1978), there are situations—especially in the case of a closely held corporation—where the relationship between the corporation and the guarantor, combined with the conditions directly imposed by the bank on the guarantor, may require that the guarantor have standing to bring such actions. The majority opinion recognizes this possibility; it therefore would be a mistake for the bench and bar to overread today's holding as precluding all such actions.

In Part II of its opinion, the majority disposes of Mid–State's claim on the ground that there is no valid allegation of fraud in the complaint that could sustain a cause of action under section 1962(a) of RICO. I agree completely with this conclusion; I only point out that this disposition ought not be read as our deciding *sub silentio* the important question of whether Mid–State has standing to bring an action under subsection (a) of section 1962.[1]

---

1. There is a controversy in the reported cases as to what injury will satisfy the standing require-

ment for a violation under 28 U.S.C. § 1962(a). The defendant in this case argues, and a num-

Finally, I believe that the district court said all that needs to be said with respect to the role of the affidavit of Professor Bryan in the disposition of the summary judgment motion:

> To support its claim that Mid–State suffered a loss due to the tying arrangement, plaintiffs point only to one paragraph in the affidavit of its financial expert, William Bryan. The paragraph states, "Further, it is my opinion that the handling of the loan arrangement and use of the locked box or blocked account by Exchange National Bank personnel was such that the likely and predictable result was the demise of Mid–State as a going concern." Bryan states he examined the pleadings, depositions, and documents in this case, but he does not recite any of the specific facts or steps in his reasoning that led him to the conclusion stated in paragraph 8 of his affidavit. Plaintiffs therefore have failed to satisfy their burden of showing specific facts in support of an essential element of their cause of action.

*Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago,* 693 F.Supp. 666, 669–70 (N.D.Ill.1988) (footnote omitted). Accordingly, I join in affirming the judgment of the district court.

ber of reported cases in this area agree, that an injury "by reason of a violation of section 1962(a)" requires injury by investment in an enterprise, not simply an injury caused by the predicate racketeering acts. *See Rose v. Bartle,* 871 F.2d 331, 357–58 (3d Cir.1989); *Grider v. Texas Oil & Gas Corp.,* 868 F.2d 1147, 1149–50 (10th Cir.1989); *Leonard v. Shearson Lehman/American Express, Inc.,* 687 F.Supp. 177, 181 (E.D.Pa.1988); *In re Rexplore, Inc. Sec. Litig.,* 685 F.Supp. 1132, 1141–42 (N.D.Cal.1988); *P.M.F. Servs., Inc. v. Grady,* 681 F.Supp. 549, 555–56 (N.D.Ill.1988); *Omega Constr. Co. v. Altman,* 667 F.Supp. 453, 464–65 (W.D.Mich.1987); *Airlines Reporting Corp. v. Barry,* 666 F.Supp. 1311, 1314–15 (D.Minn.1987); *In re Gas Reclamation, Inc. Sec. Litig.,* 659 F.Supp. 493, 511 (S.D.N.Y.1987); *Cincinnati Gas & Elec. Co. v. General Elec. Co.,* 656 F.Supp. 49, 84 (S.D.Ohio 1986); *Gilbert v. Prudential–Bache Sec., Inc.,* 643 F.Supp. 107, 109 (E.D.Pa.1986); *DeMuro v. E.F. Hutton,* 643 F.Supp. 63, 66–67 (S.D.N.Y.1986); *Eastern Corp. Fed. Credit Union v. Peat, Marwick, Mitchell & Co.,* 639 F.Supp. 1532, 1536–37 (D.Mass.1986); *Heritage Ins. Co. of America v. First Nat'l Bank of Cicero,* 629 F.Supp. 1412, 1417 (N.D.Ill.1986); and *Econo–Car Int'l Inc. v. Agency Rent–A–Car, Inc.,* 589 F.Supp. 1368, 1372 n. 1 (D.Mass.1984). Contrary authority indicates that injury caused by predicate racketeering acts is sufficient for any type of section 1962 violation. *See In re National Mortgage Equity Corp. Mortgage Pool Certificates Sec. Litig.,* 682 F.Supp. 1073, 1081–82 (C.D.Cal.1987); *Smith v. MCI Telecommunications Corp.,* 678 F.Supp. 823, 828–29 (D.Kan.1987); *Haroco, Inc. v. American Nat'l Bank & Trust Co. of Chicago,* 647 F.Supp. 1026, 1032–33 (N.D.Ill.1986); *Louisiana Power & Light Co. v. United Gas Pipe Line Co.,* 642 F.Supp. 781, 805–07 (E.D.La.1986); and *Snider v. Loan Star Art Trading Co.,* 659 F.Supp. 1249, 1255–56, *opinion upon reconsideration,* 672 F.Supp. 977 (E.D.Mich.1987), *aff'd by unpublished order,* 838 F.2d 1215 (6th Cir.1988).