930 F.2d 25
 Unpublished Disposition
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
STATE FARM FIRE AND, CASUALTY COMPANY, Plaintiff-Appellee,
v.
Dennis P. SUMMERFIELD and William E. Miles, Defendants-Appellants.
 No. 90-1331, 90-1433.
 United States Court of Appeals, Seventh Circuit.
 Argued Nov. 2, 1990.
Decided April 11, 1991.
 
 Before EASTERBROOK, MANION and KANNE, Circuit Judges.
 
 ORDER
 
 1
 William Miles struck Dennis Summerfield with a hammer. Miles was convicted of criminal battery and Summerfield obtained a civil judgment for damages against Miles in the amount of $75,000. Miles claimed insurance coverage for the damage under his parents homeowner's policy with State Farm. Under diversity jurisdiction State Farm filed for declaratory judgment in federal court against Miles and Summerfield, claiming that it was not obligated under the policy to pay the costs of Summerfield's injuries caused by Miles. The district court concluded that Summerfield's injuries were not covered due to an "intended or expected injury" exclusion in the policy. Summerfield appeals; we affirm the district court.
 
 I. Facts
 
 2
 William E. Miles is the son of John and Carol Miles who were holders of a State Farm homeowner's insurance policy. Miles lived at home with his parents in Alexandria, Indiana throughout the time the events of this case transpired. Miles had been dating Sheila Carey since August, 1982. In September of 1982 they became secretly engaged and began pooling their savings. They enrolled together at Ball State University in Muncie, Indiana. Sheila lived in an off-campus apartment in Muncie and Miles continued to live at his parents' home some distance away.
 
 
 3
 Miles had his problems. He was a full-time student in college, and had a job at a local retail store where he often worked 40-45 hours per week. He also had a burdensome commuting schedule which significantly reduced his time for study and rest. In addition, he was having personal problems with Sheila. In the winter of 1985, Sheila told Miles that their relationship and marriage plans were suspended indefinitely until Miles got some counseling to remedy what she observed to be developing personality disorders. Sheila suggested that Miles needed help in dealing with the anxiety and stress that he was experiencing from tirelessly pursuing both work and school. Her concerns also may have been influenced by the fact that she was dating Summerfield.
 
 
 4
 Miles had been laboring for some time under the impression that Sheila was interested in Summerfield. He confirmed these suspicions on December 21, 1985 when he arrived at Sheila's apartment unannounced and discovered Summerfield with Sheila. He declared the marriage was off, disrupted some furniture, slapped her and left.
 
 
 5
 A few days later, he called in an attempt to salvage the relationship. He promised to get counseling and said he would call later in the evening. At 12:30 a.m. on December 29, Miles again called Sheila from his parents' home. This time her conversation was abrupt and evasive. Miles asked her if someone else was with her in the apartment and she said that someone was. Miles assumed Summerfield was with her and decided to go over to Sheila's apartment himself.
 
 
 6
 Before leaving for Sheila's apartment, Miles went into his father's garage and got a two-pound claw hammer from out of a toolbox. Miles took the hammer with him for protection in the event some kind of confrontation occurred between him and Summerfield, an ex-Marine who was "taught to hurt people." When Miles arrived at Sheila's apartment, she let him in. Summerfield, who was asleep in another room, awakened and ordered Miles to leave. An argument ensued. Miles went into the bathroom and removed the hammer that he had concealed in the pocket of his coat. Leaving the bathroom, Miles went to the front door where Summerfield was standing. Miles swung the hammer and struck Summerfield in the head. Summerfield fell to the floor. Miles left the hammer with Sheila and went home.
 
 
 7
 Miles was arrested and ultimately pleaded guilty to battery, a Class C felony. He served three months in prison for the offense and received three years probation. In addition to the criminal charge, Miles was subjected to civil liability. In state court, Summerfield sued Miles in tort for damages resulting from his attack. Miles admitted negligence, and the trial for damages resulted in a judgment of $75,000 for Summerfield. During all relevant periods, Miles was apparently covered by his parents' State Farm insurance policy.
 
 
 8
 State Farm filed a declaratory judgment action seeking to absolve itself from having to pay judgment damages to Summerfield under Miles' parents' homeowner's policy. The district court granted State Farm's summary judgment motion holding that the damages suffered by Summerfield were "expected or intended" by Miles. The homeowner's policy excludes insurance coverage regarding any bodily or property damage which was "expected or intended" by the insured. Miles and Summerfield appeal State Farm's grant of summary judgment.[1]
 
 II. Standard of Review
 
 9
 "In examining the district court's grant of summary judgment, our duty is to review de novo the record and the controlling law." PPG Indus. v. Russell, 887 F.2d 820, 823 (7th Cir.1989). Our task is to "decide whether the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to the judgment as a matter of law." Wolf v. Larson, 897 F.2d 1409, 1411 (7th Cir.1990). The parties have no dispute respecting the facts. The only question presented by the parties relates to the legal meaning, under Indiana law, of the word "intended" in the insurance contract. In particular we are concerned with the legal determination of whether Miles' activity satisfies the legal definition of "intended" for purposes of applying the insurance contract's exclusionary clause for injuries "intended." The district court in granting summary judgment to State Farm decided that Miles' conduct comfortably fit with the legal understanding of "injury ... which is ... intended by the insured." Miles and Summerfield disagree with the district court's result, and urge us to find that Miles' conduct, as a legal matter, was not expected or intended, but simply an irresistible and involuntary impulse, for which the costs of damages are not explicitly excluded under the policy.
 
 III. Discussion
 
 10
 State Farm issued a homeowner's policy, No. 14-920134 6 (hereinafter "Policy") to John P. Miles and Carol Miles, which was in effect from August 3, 1985 to and including August 3, 1986. The Policy obligates State Farm to pay for damages to third parties resulting from bodily injury for which the insured, including any resident relative of the insureds, is legally liable. The Policy provided in pertinent part as follows:
 
 Section II--Liability Coverages
 Coverage L--Personal Liability
 
 11
 If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage to which this coverage applies, we will:
 
 
 12
 1. pay up to our limit of liability for the damages for which the insured is legally liable; and,
 
 
 13
 2. provide a defense at our expense by counsel of our choice....
 
 Coverage M--Medical Payments to Others
 
 14
 We will pay the medical expenses incurred or medically ascertained within three years from the date of an accident causing bodily injury....
 
 Section II--Exclusion
 
 15
 1. Coverage L and Coverage M do not apply to:
 
 
 16
 a. bodily injury or property damage which is expected or intended by an insured (emphasis added).
 
 
 17
 The district court, applying Indiana law, concluded that the bodily injury suffered by Summerfield was intended[2] by Miles, thus eliminating State Farm's duty to pay damages under the policy. Several cases in Indiana, interpreting similar insurance policy exclusion clauses for injuries "intended" by the insured control this case. In Home Insurance Company v. Neilsen, 332 N.E.2d 240 (Ind.Ct. of App.1975), two neighboring farmers, Neilsen and Smolek, got into an argument with the result that Neilsen hit Smolek in the face with his fist. Smolek sued Neilsen for assault and battery. Neilsen asked his insurance carrier, Home Insurance Company ("Home"), to provide a defense and possible indemnification for Smolek's suit on the basis he was covered by the comprehensive liability and medical payments provision of his homeowner's policy with Home. Home refused coverage because of a liability exclusion clause which excluded coverage for injury caused intentionally or at the direction of the insured. Neilsen brought a suit for declaratory judgment.
 
 
 18
 The trial court held that Home was required under the policy to defend and indemnify Nielsen if necessary. The Indiana Court of Appeals reversed. At issue on appeal was the proper interpretation of the policy's exclusionary clause which, in part, excluded Home's liability:
 
 
 19
 (d) under Coverage G and H [comprehensive medical & liability payments] to bodily injury or property damage caused intentionally by or at the direction of the Insured;
 
 
 20
 Id. at 242. This language is functionally equivalent to the language appearing in the State Farm policy applicable to Miles.
 
 
 21
 In defining the phrase "caused intentionally" in the policy's exclusionary clause, the appeals court held that, "[i]ntentional ... refers ... to the volitional performance of an act with the intent to cause injury, although not necessarily the precise injury or severity of damage that in fact occurs." Id.
 
 
 22
 Accordingly, we hold that the policy excludes coverage for an intentional act of the insured which was intended to cause injury. The latter intent may be established either by showing the nature and character of the act to be such that intent to cause harm to the other party must be inferred as a matter of law.
 
 
 23
 Id. at 244 (emphasis added). Without much more explanation, the court held that Neilsen's "deliberate blow to Smolek's face" with his fist was an intentional act of such a "nature" and "character" to establish the existence of his intent to cause harm as a matter of law. The court excused Home from having to defend or indemnify Neilsen.
 
 
 24
 Recently, the Indiana Supreme Court in Allstate Ins. Co. v. Herman, 551 N.E.2d 844 (Ind.1990), held that an insured's act of firing gunshots into a fleeing crowd fell within his policy's intentional act exclusion, even if the insured did not actually intend to hit any particular person. The facts of the case are as follows: For reasons unknown, a fight broke out between a Mr. and Mrs. Heroy and a group of about 20-30 people in front of Heroy's house. When Heroy saw someone in the group strike his wife in the head with a baseball bat, he freed himself from the melee, ran into his house, retrieved his wife's .32 caliber revolver, and fired a shot into the air from his porch. The group began to run away from the premises. Heroy decided to chase the group and fired four shots in the direction of the fleeing group. Charles Herman was struck in the back by one of the shots fired by Heroy. The Hermans filed a civil suit against Heroy for damages suffered from the gunshot. Heroy carried a homeowner's policy with Allstate Insurance Company. Allstate intervened and requested summary judgment on the ground that their policy excluded from coverage damages resulting from the intentional acts of the insured. The trial court denied Allstate's motion and the Court of Appeals affirmed.
 
 
 25
 In a split decision the Indiana Supreme Court reversed and rejected the Court of Appeals' distinction and its assertion that an intentional attack required a specific person as the object of the attack. Citing Neilsen, the Indiana Supreme Court affirmed the standard that "intentional" refers "to the volitional performance of an act, with an intent to cause injury ..." Id. at 845. Such intent is found as a matter of law when one "deliberately commit[s] an act which any reasonable person would deem calculated to cause injury." Id. at 846 (emphasis added). Summary judgment was awarded to Allstate in Herman, based on a showing that the insured "deliberately obtained his wife's gun" and fired the gun at the crowd as he pursued them.
 
 
 26
 It is clear from the facts of the present case that Miles, in striking Summerfield in the head with a hammer, committed an act "which any reasonable person would deem calculated to cause injury"; whose "nature" and "character" is such that "intent to cause harm to the other party is inferred as a matter of law." Under Neilsen and Herman, the foregoing facts go a long way in support of a finding that Summerfield's injuries were intended by Miles, and therefore the exclusion clause operates to State Farm's benefit in this case. However, Neilsen and Herman also ask the court to determine whether the insured's act was volitional or deliberate.
 
 
 27
 In the present case, Summerfield and Miles assert that Miles was out of control at the time of the attack. They argue that Miles' attack on Summerfield, it is argued, was an ugly impulse or reflex induced by the shocking revelation of Sheila's betrayal. They argue that Miles' conduct was not "deliberate" or "volitional" and thus the policy's exclusion clause is inapplicable.
 
 
 28
 We have serious doubts, based on the facts, concerning the validity of Summerfield's and Miles' impulse theory. On the night of the incident, Miles encountered for the second time, not the first, the fact that Sheila was having an intimate relationship with Summerfield. Miles' first discovery of the truth happened a week earlier. Presumably, whatever shock Miles was going to experience over the situation would have occurred then. Miles did in fact have an outburst during the first encounter with Summerfield. However, by the time he struck Summerfield with the hammer, Miles had had a week to absorb the situation.
 
 
 29
 On the night of the incident, Miles' first telephone call to Sheila explored reconciliation. But when he called the second time after midnight he realized that Summerfield was staying at Sheila's apartment. Miles knew that Summerfield was with Sheila again, and with that knowledge he deliberately armed himself with a hammer in anticipation of a confrontation. He drove (for one-half hour) uninvited, after midnight to Sheila's apartment. After entering the apartment he had a discussion with Sheila. When Summerfield awoke, Miles had an argument with him. There was no sudden impulse or surprise. On the contrary, he excused himself, entered the bathroom, exited and finally hit Summerfield with the hammer.
 
 
 30
 Herman gives us additional grounds for not accepting Summerfield's and Miles' impulse explanation for purposes of imposing contract liability on State Farm. In Herman, Heroy watched someone brutalize his wife with a baseball bat. In response to that attack, Heroy got a gun and started shooting, hitting someone with a bullet. Heroy's act, which the Indiana Court ruled intentional, was certainly more "impulsive" than Miles' attack which was preceded by a number of calculated and premeditated incidents. The Indiana Supreme Court did not excuse Heroy for purposes of insurance liability. While Heroy argued that his firing the gun was an impulsive act of self-defense and the defense of his wife, the court noted that self-defense does not purge an act of its intended nature. Self defense, the court correctly noted, is a justification for intended action.
 
 
 31
 Miles' provocation was far less intense than Heroy's and therefore there is far less reason to believe Miles acted on an irresistible impulse. This attack was not impulsive in any exculpatory sense; it was instead an act of preconsidered revenge. Any reasonable jury would find that Miles acted intentionally and volitionally when he struck Summerfield.[3]
 
 
 32
 Lastly, Summerfield and Miles claim that the testimony of their expert, Dr. Rodney Caudill, was given inadequate emphasis by the district court in the summary judgment proceedings. Dr. Caudill provided testimony concerning Miles' psychiatric condition at the time of the assault. Dr. Caudill testified that Miles acted on sheer impulse when he struck Summerfield, and did not have the requisite mental capacity at that time to form a meaningful intent. After having reviewed Dr. Caudill's deposition testimony, we agree with the district court that much of the doctor's testimony was irrelevant, or insufficient to establish a genuine issue of material fact regarding Miles' inability to control his impulses at the time of his assault on Summerfield. Dr. Caudill's testimony took the form of a blanket conclusion concerning Miles' state of mind devoid of any indication of the steps in his reasoning. The doctor does not provide any clinical evidence which would convince us that his interpretation of Miles' conduct necessarily follows from the application of psychiatric medicine. In other words, his testimony does not adequately displace other "guesstimates" of Miles' ability to control himself, based on the facts. The party opposing summary judgment must present specific facts showing that there is a genuine issue for trial. Dr. Caudill did not present any clinical evidence or any other facts which support his conclusion that Miles could not have formed an intent to strike and injure Summerfield. As we have shown above, those same facts almost inevitably lead to a different interpretation concerning Miles' intentions and willingness to strike Summerfield. Summary judgment cannot be avoided simply by presenting the factually unsupported musings of an expert. Cf. Mid-State Fertilizer v. Exchange National Bank, 877 F.2d 1333 (7th Cir.1989), holding that "an expert's declaration, full of assertion but empty of facts and reasons, won't get a case past a motion for summary judgment, for the judge must 'look behind [the expert's] ultimate conclusion ... and analyze the adequacy of its foundation.' " Id. at 1339, quoting from Richardson v. Richardson-Merrell, Inc., 857 F.2d 823, 829 (D.C.Cir.1988). See also Merit Motors Inc. v. Chrysler Corp., 569 F.2d 666, 673 (D.C.Cir.1977).
 
 
 33
 For the above reasons we find that Miles' assault on Summerfield was volitional, deliberate, and such that "any reasonable person would deem calculated to cause injury." Summerfield's injuries were "intended" by Miles and the resulting damages are not covered under the State Farm policy. The grant of summary judgment to State Farm is
 
 
 34
 AFFIRMED.
 
 
 
 [1]
 Both Summerfield and Miles were named defendants. On appeal only Summerfield filed briefs, but since their interests are totally interlocked we will refer to them jointly
 
 
 [2]
 Since the definition of "intended" controlled, the court did not need to reach the meaning of "expected."
 
 
 [3]
 Moreover, Miles pleaded guilty to (and was subsequently convicted of) criminal battery with serious bodily injury. By doing so, Miles admits to the commission of a volitional, intentional act. See Ind.Code Sec. 34-3-18-1 which states:
 Evidence of a final judgment, entered after a trial or upon a plea of guilty, adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year, shall be admissible in any civil action to prove any fact essential to sustaining the judgment, and is not excluded from admission as hearsay regardless of whether the declarant is available as a witness. The pendency of an appeal may be shown but does not affect the admissibility of evidence under this section.
 Thus, Miles' guilty plea is admissible in this case as an admission that he acted intentionally in swinging the hammer. Cromer v. Sefton, 471 N.E.2d 700, 705 (Ind.Ct.App.1984). See also Brown v. Green, 738 F.2d 202, 206 (7th Cir.1984) (applying Illinois common law rule that treats guilty pleas as an admission by the defendant of the facts alleged in the complaint that may be used against the defendant in a subsequent proceeding).